ILENE JAROSLAW (IJ0569)
PHILLIPS NIZER LLP
485 Lexington Avenue, 14th Fl.
New York, NY 10017
ijaroslaw@phillipsnizer.com
Telephone: (212) 977-9700
*Attorney for Plaintiff Craig Maurizi*

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CRAIG MAURIZI,<br><br>                         Plaintiff,<br><br>               - against -<br><br>RICHARD CALLAGHAN, BUFFALO SKATING CLUB, INC.,  PROFESSIONAL SKATERS ASSOCIATION, and THE UNITED STATES FIGURE SKATING ASSOCIATION d/b/a U.S. FIGURE SKATING,<br><br>                         Defendants. | **COMPLAINT AND**<br>**JURY DEMAND** |

Plaintiff CRAIG MAURIZI ("Craig"), by his attorneys, Phillips Nizer LLP, for his

Complaint against Defendants RICHARD CALLAGHAN ("Callaghan"), BUFFALO SKATING

CLUB ("BSC"), PROFESSIONAL SKATERS ASSOCIATION ("PSA"), and THE UNITED

STATES FIGURE SKATING ASSOCIATION d/b/a U.S. FIGURE SKATING ("USFS"),

alleges as follows:

**PRELIMINARY STATEMENT**

1.      On February 14, 2019, Governor Andrew M. Cuomo signed into law the Child

Victims Act ("CVA") in an effort to bring "justice to people who were abused, and right the

wrongs that went unacknowledged and unpunished for too long."  The CVA created, *inter alia*, a

one year window, from August 14, 2019 through August 14, 2020,[1] in which survivors of childhood sexual abuse could bring suit against their abusers and the organizations or persons that should have done something to stop or prevent the abuse from happening but failed to do so.[2]  The CVA applies no matter how old a survivor is, or how long ago the abuse took place. Upon Governor Cuomo's signing of the CVA, State Senator Brad Hoylman, Chair of the Senate Judiciary Committee and lead sponsor of the CVA, said "survivors of child sexual abuse in New York State finally have the opportunity to seek justice against their abusers and the institutions who may have harbored them."

2.      Plaintiff Craig Maurizi is one of the survivors of childhood sexual abuse for whom the CVA was created.  When Craig was thirteen years old, with dreams of becoming a champion figure skater, he first met Defendant Richard Callaghan, a prominent figure skating coach.  Callaghan used his position of trust and authority to groom Craig psychologically for what turned into nearly a decade of sexual abuse.  Callaghan's conduct was that of a textbook child sexual predator.  Callaghan exploited Craig's vulnerability due to his parents' divorce, manipulating Craig to make him increasingly isolated and dependent on Callaghan.  Callaghan tempted Craig with pornography and alcohol, and gradually escalated his demands from sexual banter, to forcibly touching Craig's genitals, to mutual masturbation, and ultimately to oral and anal sex.  As Callaghan further ensnared Craig, Craig turned to drugs and developed an eating disorder to cope with Callaghan's iron fisted control over his life and the constant sexual abuse.

3.      When Craig finally healed enough to find the strength to speak out publicly about his abuse in 1999, the statute of limitations prevented any civil or criminal action against

---

[1] Now codified at New York Civil Practice Rules and Procedures § 214-G.

[2] On May 11, 2020, Governor Cuomo, by Executive Order, extended the limitations period for an additional five months, to January 14, 2021.  On May 27, 2020, the New York State Assembly and the New York State Senate passed a bill to extend the limitations period through August 14, 2021. The bill has not been signed by Governor Cuomo as of the date of this Complaint.

Callaghan.  In an effort to protect other skaters from suffering abuse at Callaghan's hands, Craig turned to Defendants USFS and PSA, asking them to use their ethical codes to strip Callaghan of his memberships.  This would make Callaghan undesirable as a coach because he could not coach his students at USFS sanctioned competitions.  Yet USFA and PSA were more concerned with covering up their own knowledge of and complicity in Callaghan's abuse than holding Callaghan accountable for his gross abuse of power as a coach and protecting young figure skaters from abuse.  Instead, USFS and PSA conspired to circumvent their own internal procedures to sweep Craig's complaints under the rug.  But now, thanks to the CVA, Craig is able to bring this suit for assault, battery, aiding and abetting, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence, and can finally seek the justice he has been denied for too long.

## SUBJECT MATTER JURISDICTION AND VENUE

4.      Maurizi is an individual domiciled in the State of New Jersey.

5.      Upon information and belief, Callaghan is an individual domiciled in the State of Florida.

6.      Upon information and belief, BSC is a not-for-profit corporation duly organized and existing under the laws of the State of New York.  BSC maintains its principal place of business in Buffalo, New York.  Upon information and belief, it operates ice skating rinks and arenas at the following three locations: 156 Tacoma Avenue, Buffalo, New York; 1300 Elmwood Avenue, Buffalo, New York; and 1 Grigg Lewis Way, Lockport, New York.

7.      Upon information and belief, PSA is a not-for profit corporation duly organized and existing under the laws of the State of Minnesota.  PSA maintains its principal place of business at 3006 Allegro Park SW, Rochester, Minnesota.

8.      Upon information and belief, USFS is a not-for profit corporation duly organized and existing under the laws of the State of Colorado.  USFS maintains a principal place of business at 20 First Street, Colorado Springs, Colorado.

9.      This action arises under the laws of the State of New York.  This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332, as no Defendant is resident in the same state as Plaintiff and Plaintiff demands damages in excess of the $75,000 jurisdictional limit.

10.     Venue is proper in the Western District of New York pursuant to 28 U.S.C. §1391(b)(2) as a substantial part of the events or omissions giving rise to the claim and the threatened and actual harm to Plaintiff occurred in this district by reason of Defendants' conduct as alleged below.

## FACTS COMMON TO ALL CLAIMS

### BACKGROUND

11.     Plaintiff Craig Maurizi is a professional figure skating coach and a former competitive figure skater.  Craig is a seven-time U.S. National Competitor in pairs figure skating and a three-time member of Team USA.  He was also the 1985 World Universaide Champion, and an alternate for the 1988 U.S. Olympic Team.

12.     Craig was born February 19, 1963 in Buffalo, New York, and five days later was adopted by Jerome and Jean Maurizi.

13.     At the age of five, Craig's pediatrician recommended that he participate in activities that promoted leg and foot turn out, such as figure skating, because his feet were turning inward.

14.     Jean enrolled him in group figure skating lessons at the Audubon Ice Rink in Amherst, New York.  Approximately three years later, Craig began taking private figure skating

lessons, all with coaches Jean selected.  Over the next five years, Jean switched Craig between several coaches, finally settling with Defendant Callaghan in 1976 when Craig was approximately thirteen years old.  She selected Callaghan because he was the most experienced coach in the area with a reputation for strict discipline.

15.     Callaghan maintained an office and worked at a skating rink leased by Defendant BSC.  Callaghan was a member of Defendants USFS and PSA.  In order for a coach to participate in USFS-sanctioned competitions, the coach must be a member of USFS.   Had Callaghan not been a member of USFS, Jean would not have selected him to coach Craig because Callaghan would not have been able to coach Craig during USFS-sanctioned competitions. It is a significant handicap for any skater to compete without the guidance and support of their coach throughout their competitions.

## USFS AND PSA PROFESSIONAL ETHICS RULES

16.     In order to be a member of USFS, a coach must abide by the organization's rules. Upon information and belief, Rule 1.02 of the Code of Ethics in effect during the period of Craig's abuse required members to "exemplify the highest standards of fairness, ethical behavior and genuine good sportsmanship in any of their relations with others. Any person whose acts, statements or conduct is considered detrimental to the welfare of figure skating is subject to the loss of privilege of registration."

17.     Upon information and belief, under the USFS Code of Ethics, coaches providing their minor students with alcohol and pornography and engaging in sexual activity with them constitutes conduct that is detrimental to the welfare of figure skating.

18.     The mission of the PSA is to raise the level of professionalism among figure skating coaches.  In order to be a member of PSA, a coach must abide by a Code of Ethics. Upon information and belief the Code of Ethics in effect during the period of Craig's abuse required

that "Members shall at all times be mindful that he or she has the responsibility to influence his or her student to act with dignity, ethically and with high moral conduct. The members shall never place the value of winning above the value of instilling the highest desirable ideas of character in his or her student nor shall the member act in any manner inconsistent with a high standard of ethical and moral conduct."

19.     Upon information and belief, the Code of Ethics in effect during the period of Craig's abuse further required that "The members shall take an active role in the prevention of drugs, alcohol and tobacco abuse and under no circumstances should authorize the use of such products."

20.     Upon information and belief, the Code of Ethics in effect during the period of Craig's abuse further required that "Members shall not engage in, nor shall a member permit, any skater with whom they are charged with the responsibility of coaching, to engage in any offense in violation of federal, state or local law, or laws of a foreign government."

21.     Upon information and belief, coaches providing their minor students with alcohol and pornography and engaging in sexual activity with them does not comport with the PSA's ethical standards.

## CALLAGHAN GROOMS YOUNG CRAIG FOR ABUSE

22.     Craig had been competing in figure skating since the age of ten, but he did not fully commit himself to the sport until 1977 when he was 14 years old.  Craig broke his ankle only four weeks before a major figure skating competition while playing on his high school football team.  Callaghan told him that he needed to decide whether he was going to commit to specializing in figure skating and give up other sports.  Otherwise, Callaghan said, Craig would not be able to achieve his dreams of becoming a championship figure skater.  Craig made the choice to fully commit himself to figure skating.

23.     This meant Craig gave up participation in other sports, such as baseball, football, and basketball, as well as all other extracurricular activities.  He skated five to seven hours a day, every day, except Sunday.  Monday through Friday, Craig was at the skating rink before school, often before the sun was up, attended a full day of school, and then returned to the rink to practice for several more hours.  On Saturdays, Craig spent the full day at the rink.

24.     As Craig became more committed to figure skating, Craig's parents were having increasing marital problems which eventually led to their divorce.  Craig found himself withdrawing from both his parents as their conflict increased.  He stopped speaking to his father, whom he blamed for the destruction of his parents' marriage.  Jean was emotionally devastated by the divorce and Craig found himself having to provide her with emotional support.  He turned to Callaghan as a confidant and Callaghan advised Craig how to manage his parents' conflict and maintain his focus on his skating and moving his life forward.

25.     Craig's estrangement from his father, and his mother's inability to address her own emotional needs, much less Craig's, meant there was no one to protect him from Callaghan.  Callaghan recognized Craig's vulnerability due to the breakdown of his parents' marriage and began to groom him for sexual abuse.

26.     Callaghan began by asking Craig questions of a sexual nature, such as whether he ever masturbated.  As an embarrassed fourteen year old, Craig denied masturbating.  But Callaghan persisted in his questioning for several weeks, telling Craig that everyone masturbates.  Finally, Craig admitted that he did as well.

**CALLAGHAN SEXUALLY ABUSES CRAIG FROM AGE 14**

27.     Once he got the answer he wanted, Callaghan's tactics escalated.  He began pressuring Craig to tell him how often he masturbated.  He started showing Craig pornographic magazines and asking if they gave him an erection.  He escalated from asking to grabbing

Craig's genitals to check if he had an erection. Callaghan's conduct constituted Criminal

Forcible Touching under New York Penal Law Section 130.52.

28.     Callaghan would then show Craig through his pants when he had an erection.

Eventually, Callaghan began to masturbate in front of Craig, and encouraged Craig to masturbate

in front of him.

29.     In 1978, when Craig was fifteen, his parents' divorce was finalized. Craig

became more emotionally dependent on Callaghan, believing that Callaghan was the only person

in his life that he could trust. Having gained such a high level of trust, and having conditioned

Craig to normalize the abuse, Callaghan again escalated his tactics.

30.     Callaghan kept beer in the refrigerator in his office, and he began to encourage

Craig to drink in his office. Upon information and belief, Defendant BSC was aware that

Callaghan kept alcohol in his office and that he provided it to minor students, including Craig.

31.     Craig began to think that the way Callaghan treated him meant he must be special,

and he developed a fierce loyalty to Callaghan. Callaghan exploited that loyalty by escalating

his sexual demands to Callaghan and Craig masturbating one another.

32.     As the psychological consequences of the abuse started to emerge, Craig began

using marijuana and LSD as a coping mechanism. At the same time that Callaghan was

encouraging Craig to consume alcohol to make him more susceptible to Callaghan's abuse,

Callaghan began pressuring Craig about losing weight and instituted daily weigh-ins. Desperate

to please Callaghan, Craig began engaging in bulimic behaviors, which developed into an eating

disorder.

33.     Callaghan pulled Craig further into his world, having Craig spend time with

Callaghan's family, an escape Craig needed due to his parent's divorce. Craig began babysitting

the Callaghans' daughter.  As he became more enmeshed in the Callaghan family, Callaghan's

sexual demands increased.

34.     In addition to increasing exposure to pornography and sexual activity, when Craig

was sixteen, Callaghan began demanding to perform oral sex on him. Craig did not want to, but

he was more afraid of saying no to Callaghan than of the act itself.  Callaghan would provide

Craig with alcohol before engaging in oral sex with him. Callaghan's conduct constituted

Criminal Sexual Conduct under New York Penal Law Section 130.40.

35.     Upon information and belief, Defendant BSC was aware of Callaghan's abuse of

Craig, but permitted Callaghan to continue to use their facilities for his illegal and illicit

purposes.

36.     Upon information and belief, numerous members of USFS and PSA, were aware

that Callaghan was abusing Craig.

37.     As the sexual activity increased, Callaghan began taking Craig to bars.  The

increased alcohol consumption necessary for Callaghan's sexual abuse made it more and more

difficult for Craig to keep his weight a level necessary for competitive skating.  Craig began

throwing up when he knew he had a weigh in and was afraid he would not make his target

weight.  Callaghan was aware of the behaviors Craig engaged in to make weight, but did nothing

to help Craig manage his weight without needing to resort to bulimic behavior.  Craig was also

using marijuana two to three times a week.

38.     Upon information and belief, numerous members of USFS and PSA were aware

that Callaghan was providing Craig, his underage student, with alcohol and bringing him to bars.

39.     Craig became closer with Callaghan's wife and daughter, as Callaghan's family

became a substitute for his own.  He spent more time at their home and going on outings with

them, such as golfing.

**BSC, PSA, USFS FAIL TO STOP CALLAGHAN; THE ABUSE CONTINUES**

40.     Upon information and belief, in 1980 Callaghan was pushed out of BSC, in part because of his abuse of Craig.  Rather than take any steps to stop Callaghan's abuse, such as making an official report to USFS, PSA, or law enforcement, BSC instead foisted him on another skating club, the Philadelphia Skating Club and Humane Society in Pennsylvania.

41.     Upon information and belief, it was widely known among members of USFS and PSA that Callaghan had been pushed out of BSC because of his abuse of Craig and others.

42.     Craig moved to Philadelphia to continue training with Callaghan, and got his first apartment.  There was a dramatic increase in sexual activity with Callaghan, as Craig's apartment gave them complete privacy.  Callaghan came to Craig's apartment approximately three times a week to engage in sexual activity.

43.     Callaghan continued to encourage Craig's extensive consumption of alcohol, even taking him from Philadelphia to New Jersey which at the time had a lower drinking age. Callaghan also began taking Craig to strip bars.

44.     As the sexual and alcohol abuse increased, so did Craig's bulimia.  Living independently gave Craig the privacy to binge and purge every day.  Craig was enrolled in Harcum College, studying Business Marketing and Management.  On his way home from classes, Craig would order half a dozen or more cheeseburgers.  He would eat them in the car and then vomit them up when he got home.  In order to be alert and energetic for skating practice, Craig would then consume large quantities of caffeine and take Dexatrim, a diet pill with a stimulant effect.

45.     In 1982 Craig was arrested for underage drinking.  Callaghan bailed him out and insisted that Craig give up his apartment and come live with him.  The sexual abuse continued over the next several years, and Callaghan became more and more controlling.

**CALLAGHAN CONTINUES TO TORMENT CRAIG AS AN ADULT**

46.      In 1985, when Craig began dating women, Callaghan's jealousy emerged.  One night, Callaghan came to Craig's girlfriend's house and banged on the front door, cursing and screaming for Craig to come out.  He left when he realized Craig was not going to leave with him.

47.      Callaghan continued following Craig, leading Craig to lie about where he was going and with whom he was spending time.  Finally, on or about his twenty-third birthday, Craig took the first step towards freeing himself from Callaghan.  Craig worked up the courage to tell Callaghan that he no longer wanted to engage in sexual activity with him, especially with Callaghan's wife and daughter sleeping down the hall.  Callaghan reluctantly agreed.

48.      In 1986, Craig moved with Callaghan to Colorado Springs to train at the Broadmoor World Arena.  Craig rented his own apartment in Colorado Springs.  While Callaghan's sexual abuse had largely stopped, Craig's bulimia grew worse, with him binging and purging multiple times a day.

49.      Craig continued to try to separate himself from Callaghan, but they still went out drinking together.  Callaghan occasionally took these outings as an opportunity to initiate sex and tried to grab Craig's genitals, but Craig refused and rebuffed him.

50.      The more Craig rejected his sexual advances, the more obsessed Callaghan became with Craig's social activities.  He frequently drove to Craig's apartment and either knocked on Craig's door or looked into the window to see what Craig was doing. On several occasions, he found Craig with a woman in his apartment and exploded in a rage every time. He screamed to be let in. He called one woman a whore. He camped out all night once in front of the apartment to see what time Craig's girlfriend left.  Craig finally decided to quit competitive skating in December 1987.

51.    However, Craig was not yet able to completely separate from Callaghan, as Craig worked as Callaghan's assistant coach at the San Diego Ice Arena for several more years.

52.    In 1989, Craig met the woman whom he would eventually marry.  Callaghan did not interfere in this relationship, and in 1991 the couple married.  Upon returning from their honeymoon, Craig and his wife moved to St. Clair Shores, Michigan where Craig worked as the Skating Director of the St. Clair Shores Figure Skating Club.

53.    In April 1992, Craig and his wife moved to Omaha, Nebraska where Craig served as the Director of Skating at the Figure Skating Club of Omaha. Over the next few years, the only contact Craig had with Callaghan was when they saw each other at various competitions.

54.    On three separate occasions, beginning in February 1995, Callaghan called Craig and asked him to come be his assistant at the Detroit Skating Club in Michigan. Craig rejected the offers, finally enjoying his life free from him Callaghan.  But his wife, whom he had never told about Callaghan's abuse, could not understand why Craig would refuse such an opportunity.

55.    The Detroit Skating Club was the premiere training center in the United States at the time.  Among others, Callaghan was coaching Nicole Bobek, the 1995 Ladies' Singles National Champion and World Championship bronze medalist, and Todd Eldredge, the 1995 Men's Singles National Champion and World Championship silver medalist.  Becoming Callaghan's assistant coach would be a huge step in Craig's career as a coach. Unable and afraid to explain Callaghan's manipulation and abuse to his wife, Craig felt he had no choice but to accept Callaghan's offer.  Craig and his wife moved to Bloomfield Hills, Michigan in September 1995 so Craig could work as Callaghan's assistant coach at the Detroit Skating Club.

56.    Gradually, Craig began to feel Callaghan's control and manipulation again. He was conflicted as the feelings of devotion and loyalty that had enabled the years of abuse

resurfaced, while becoming angry at Callaghan's attempts to intimidate him and belittle his coaching.

57.     A major point of conflict was a young skater Craig had recruited to the Detroit Skating Club.   Callaghan's relationship with the skater and her parents became increasingly strained because they believed Callaghan was not investing enough time and effort in their daughter in favor of other skaters.  Her parents also felt Callaghan, while not investing in their daughter, wanted to control her every movement.

58.     As a result of this conflict, Craig's role in her training continued to increase.  At one point, her parents asked that Craig take over as their daughter's main coach.  Callaghan was infuriated and forbid Craig from even speaking with them.  This further inflamed the relationship and, after the 1998 Winter Olympics, the skater's parents fired Callaghan and hired Craig as their daughter's main coach.

59.     Callaghan was furious with Craig, accusing him of stealing the skater away from him, and refused to speak with Craig.  Craig was dumbfounded and angered by Callaghan's treatment of him.  Craig had remained loyal to Callaghan, despite rampant rumors, which were all true, of his manipulation and abuse at Callaghan's hands.  This caused an irreparable rift between Craig and Callaghan, allowing Craig to finally, completely, break free of Callaghan's control.

**CALLAGHAN'S ABUSE OF CRAIG WAS NO SECRET TO BSC, PSA, USFS**

60.     Upon information and belief, as far back as the 1970s, Callaghan's molestation of young students was an open secret throughout the United States figure skating community, and Craig's abuse at Callaghan's hands was widely known among members of BSC, USFS, and PSA, including the organizations' officers and directors.  Upon information and belief, at BSC, a

Zamboni driver walked in on Callaghan molesting a student and made a complaint to a member of BSC's Board of Directors, but no action was taken and the complaint was buried.

61.     Upon information and belief, another BSC Board member prohibited his child from training with Callaghan because he had learned that Callaghan was sexually involved with boy skaters.  After one competition where parents became aware of Callaghan's conduct, they complained to other BSC Board members, who chose to wait until the end of the competition season to fire Callaghan.  Much like the hierarchy of the Catholic Church, BSC did nothing to stop Callaghan, but merely passed him along to the next skating club looking for a coach who could produce winners.  They did nothing to protect the skaters, including Craig, who were being abused by Callaghan.

62.     As far back as 1974, a USFS National Judge received a complaint about Callaghan's conduct, but took no action.  In the late 1970s, a group of USFS National Judges, one of whom was a BSC Board member, discussed the rumors that Callaghan was engaging in sexual activity with boy skaters.  Upon information and belief, another USFS National judge warned a rink not to hire Callaghan because he was abusive.  Members of USFS warned skaters not to be alone with Callaghan in the locker rooms.  A skating coach was called by a former President of USFS and warned that Callaghan was a terrible person.

63.     Yet no action was taken to terminate Callaghan's membership in USFS, thereby denying him access to young skaters to prey upon.

64.     During an Olympic training camp, Callaghan made a pass at a male skater, who punched Callaghan in response.  The incident was widely known, and the skater left the camp. Upon information and belief, Callaghan's conduct was so widely known that a figure skater did a stand-up comedy routine about Callaghan's sexual abuse of boy skaters.   Upon information and

belief, skaters referred to Callaghan's black leather gloves as "molester gloves," and Callaghan was known by the nickname "Tricky Dicky."

65.     Yet no one in BSC, USFS, or PSA took any action that would lead to the revocation of Callaghan's USFS and PSA memberships and the protection of Craig and other students from Callaghan's abuse.

## USFS COVERS UP CALLAGHAN'S ABUSE

66.     Having finally faced down the fear and shame of Callaghan's abuse, Craig became determined to protect other students from Callaghan.  In April 1999, Craig decided to publicly reveal his years of abuse and filed an ethics complaint, known as a grievance, against Callaghan with USFS.

67.     Immediately, in an effort to protect Callaghan and avoid exposure of its own knowledge and complicity, USFS took action to bury Craig's claims.  Despite having told the Associated Press that "There will be no knee-jerk reaction," James Disbrow, USFS's then-President and Callaghan's longtime friend and confidant,[3] made sure that Craig's claims would not receive a hearing.

68.     Upon information and belief, Disbrow himself was known to have sexual relationships with male skaters during his career as a coach.  Disbrow could not let the truth about Callaghan's abuse of Craig be known, lest he become implicated himself.

69.     Disbrow's first move was to remove the USFS Grievance Committee Chair, Steven Hazen, from his position.  Hazen believed this was a "blatant attempt to interfere with the grievance process" in an "effort to intimidate [Hazen] into abandoning [his] responsibilities."  It

---

[3] Upon information and belief, as young skaters in Buffalo, Disbrow and Callaghan both were coached by David Lowrey.  Upon information and belief, when Disbrow was approximately sixteen years old, he was adopted by Lowery and his wife.  Upon information and belief, in 2004, Lowery was permanently banned from membership in USFS after being convicted of sexually abusing one of his skaters.

was clear to Hazen that there were people at USFS who were determined to stop any investigation into Callaghan's abuse.

70.     Hazen was instructed to forward the materials he had collected to the ethics committee chair. If that official decided the claims had merit, Hazen was told, the matter would be sent back to the grievance committee, which would empanel a three-person commission to conduct an investigation and determine whether the claims were valid.

71.     Disbrow's next move was to replace the chair of the ethics committee.  Then Disbrow short-circuited the process and instead rendered a decision himself, to ensure that evidence of Callaghan's abuse and USFS's complicity in and enabling of that abuse, would never come to light.

72.     Approximately one month after Craig filed his complaint, and before anyone at USFS interviewed him about the abuse, Disbrow informed the new ethics committee chair, Jon Jackson, that Maurizi's claims were not being referred to the ethics committee after all, but instead were being dismissed.   The next day, Jackson sent a letter to Craig informing him that his complaint was dismissed because the USFS bylaws stipulate that grievances must be filed within 60 days of the alleged violation or its discovery.

73.     The fact that the USFS bylaws allowed the organization itself to bring a grievance upon learning that a coach was alleged to have molested a student, and groomed that student with alcohol and pornography, was intentionally ignored because Disbrow was committed to protecting Callaghan, himself, and USFS at the cost of the safety of young skaters.

### PSA COVERS UP CALLAGHAN'S ABUSE

74.     Maurizi also filed a grievance with PSA in 1999 in an effort to have Callaghan's coaching credentials revoked.  As with USFS, PSA was more concerned with protecting itself

and Callaghan than looking after the safety of young skaters.  The PSA's then-President, Jerry Lane, was a childhood friend of Callaghan's.

75.     Upon information and belief, Lane selected a committee of three coaches to hear Craig's grievance.  The identity of the committee members was never provided to Craig.  Upon information and belief, based solely on written submissions from Craig and Callaghan, without ever having interviewed Craig or conducting any factual investigation, PSA's anonymous three-person committee "unanimously found no violation of the ethics standards of the organization" with respect to any of Craig's claims.

## SAFESPORT SUSPENDS CALLAGHAN FROM COACHING

76.     In January 2018, Craig filed a complaint about Callaghan's abuse with the U.S. Center for SafeSport ("SafeSport"), the U.S. Olympic Committee's misconduct watchdog.  On March 8, 2018, SafeSport and USFS issued a preliminary order barring Callaghan from all USFS-sanctioned events.

77.     On or about August 21, 2019, following an extensive, 18-month investigation, SafeSport found Callaghan permanently ineligible due to sexual misconduct involving a minor. USFS, in compliance with SafeSport's finding, also permanently banned Callaghan from membership.

78.     Callaghan appealed his permanent ineligibility through SafeSport's arbitration process.  On or about December 16, 2019, the arbitrator modified SafeSport's order, reducing the penalties to a three-year suspension, 15-year probation, and 100 hours of community service.

79.     Upon information and belief, while the arbitrator reduced Callaghan's penalties, the arbitrator did not dispute SafeSport's finding that Callaghan had engaged in sexual misconduct with Craig.

### FIRST CLAIM FOR RELIEF
**(ASSAULT as to Callaghan)**

80.     Craig repeats and realleges each of the allegations set forth in paragraphs 1 through 79 hereof with the same force and effect as if fully set forth herein.

81.     Callaghan's conduct of grabbing Craig's genitals and engaging in various sexual activities while Craig was not of the age of consent repeatedly placed Craig in apprehension of imminent harmful and offensive contact.

### SECOND CLAIM FOR RELIEF
**(AIDING AND ABETTING ASSAULT as to BSC, USFS, and PSA)**

82.     Craig repeats and realleges each of the allegations set forth in paragraphs 1 through 79 hereof with the same force and effect as if fully set forth herein.

83.     Upon information and belief, BSC, USFS, and PSA willfully ignored information about Callaghan's abuse of Craig.  Despite this information, BSC, USFS, and PSA continued to allow Callaghan to use his positions within their organizations to have access to and to assault Craig.  Without those positions, Callaghan would not have had access to Craig to perpetrate the assaults.

84.     Upon information and belief, in an attempt to protect Callaghan from punishment for his abuse of Craig, USFS, PSA, and Callaghan conspired to conceal the truth about his assaults on Craig.

### THIRD CLAIM FOR RELIEF
**(BATTERY as to Callaghan)**

85.     Craig repeats and realleges each of the allegations set forth in paragraphs 1 through 79 hereof with the same force and effect as if fully set forth herein.

86.     Callaghan, through his conduct of grabbing Craig's genitals and engaging in various sexual activities while Craig was not of the age of consent, repeatedly and intentionally made bodily contact of an offensive nature with Craig.

## FOURTH CLAIM FOR RELIEF
### (AIDING AND ABETTING BATTERY as to BSC, USFS, and PSA)

87.     Craig repeats and realleges each of the allegations set forth in paragraphs 1 through 79 hereof with the same force and effect as if fully set forth herein.

88.     Upon information and belief, BSC, USFS, and PSA willfully ignored information about Callaghan's abuse of Craig.  Despite this information, BSC, USFS, and PSA continued to allow Callaghan to use his positions within their organizations to have access to and to batter Craig.  Without those positions, Callaghan would not have had access to Craig to perpetrate his battery of Craig.

89.     Upon information and belief, in an attempt to protect Callaghan from punishment for his abuse of Craig, USFS, PSA, and Callaghan conspired to conceal the truth about his battery of Craig.

## FIFTH CLAIM FOR RELIEF
### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS as to Callaghan)

90.     Craig repeats and realleges each of the allegations set forth in paragraphs 1 through 79 hereof with the same force and effect as if fully set forth herein.

91.     Callaghan, through his conduct of providing Craig with alcohol and pornography, grabbing Craig's genitals, and engaging in various sexual activities while Craig was not of the age of consent, engaged in intentional or reckless extreme and outrageous conduct that caused Craig severe emotional distress, which manifested itself, *inter alia,* through substance abuse and an eating disorder.

## SIXTH CLAIM FOR RELIEF
### (NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS as to Callaghan)

92.     Craig repeats and realleges each of the allegations set forth in paragraphs 1 through 79 hereof with the same force and effect as if fully set forth herein.

93.     Callaghan, through his conduct of providing Craig with alcohol and pornography, grabbing Craig's genitals, and engaging in various sexual activities while Craig was not of the age of consent, breached his duty as a certified figure skating coach to properly supervise his student and to refrain from engaging in illegal and harmful conduct with him.

94.     Callaghan's neglect of his duty to Craig caused severe emotional distress, which manifested itself, *inter alia*, through substance abuse and an eating disorder.

**SEVENTH CLAIM FOR RELIEF**
**(NEGLIGENCE as to BSC)**

95.     Craig repeats and realleges each of the allegations set forth in paragraphs 1 through 79 hereof with the same force and effect as if fully set forth herein.

96.     BSC had a duty to provide a safe environment for students who trained at its facility.  BSC had a duty to prevent its coaches from harming the students who trained at its facility.  By allowing Callaghan to coach at its facility, despite its awareness of reports and complaints that Callaghan was providing underage students with alcohol and pornography at its facility, that Callaghan was sexually harassing boy skaters, and that Callaghan was engaging in sexual activity with boy skaters, BSC breached its duty to provide a safe environment and protect students from harm.

97.     As a result of BSC's breach of its duties, Craig suffered severe emotional distress, which manifested itself, *inter alia*, through substance abuse and an eating disorder, and was thus damaged.

**EIGHTH CLAIM FOR RELIEF**
**(NEGLIGENCE as to USFS and PSA)**

98.     Craig repeats and realleges each of the allegations set forth in paragraphs 1 through 79 hereof with the same force and effect as if fully set forth herein.

99.     USFS and PSA had a duty to Craig to ensure that the coaches it certified and permitted to coach under their auspices did not engage in conduct that was harmful or detrimental to students and to refrain from encouraging students to engage in illegal activity.

100.     By ignoring numerous reports and complaints that Callaghan was providing underage students with alcohol and pornography, sexually harassing boy skaters, and engaging in sexual activity with boy skaters, particularly Craig, USFS and PSA breached their duty to him.

101.     As a result of USFS's and PSA's breaches of their duties, Craig was subjected to severe emotional distress, which manifested itself, *inter alia*, through substance abuse and an eating disorder, and was thus damaged.

## NINTH CLAIM FOR RELIEF
### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS as to USFS and PSA)

102.     Craig repeats and realleges each of the allegations set forth in paragraphs 1 through 79 hereof with the same force and effect as if fully set forth herein.

103.     USFS, in an effort to protect Callaghan and itself, engaged in a scheme to discredit Craig and his allegations and manufacture a process that would allow Disbrow to dismiss Craig's complaint without conducting even a rudimentary investigation into whether Callaghan was a dangerous predator who should not be permitted access to young students.

104.     USFS's extreme and outrageous conduct of dismissing Craig's complaint with complete disregard for determining whether his claims were true caused him severe emotional distress, as his experience as a survivor of sexual abuse was denied and his abuser was allowed to continue having access to young students.  The knowledge that USFS did not care that it was enabling a child predator, and that he was unable to prevent Callaghan from abusing other young students, caused Craig severe emotional pain and distress.

105.     Likewise, PSA's outrageous conduct of finding that Craig's allegations that Callaghan provided him with alcohol and pornography when he was underage, that he

manipulated and groomed him, and then sexually abused him for years, was not a violation of the PSA's ethical standards was emotionally devastating for Craig.  PSA's outrageous conduct of continuing to enable a child predator caused Craig severe emotional pain and distress, as his efforts to protect young students failed.

WHEREFORE, Plaintiff seeks judgment as follows:

106.    Ordering Defendants to pay damages in an amount not less than $10,000,000.

107.    Ordering Defendants to pay an appropriate amount as punitive damages to deter their willful and wanton conduct; and

108.    Granting Plaintiff such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff Craig Maurizi demands trial of his claims for relief herein before a jury.

Dated:  New York, New York             PHILLIPS NIZER LLP
        July 20, 2020

                                       By:  s/ Ilene Jaroslaw
                                            Ilene Jaroslaw
                                            485 Lexington Avenue, 14th Floor
                                       New York, New York 10017
                                       (212) 977-9700

                                       *Attorney for Plaintiff Craig Maurizi*