UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CRAIG MAURIZI,

                      Plaintiff,

             v.

RICHARD CALLAGHAN,
BUFFALO SKATING CLUB, INC.,
PROFESSIONAL SKATERS ASSOCIATION, and
THE UNITED STATES FIGURE SKATING
 ASSOCIATION, d/b/d U.S. Figure Skating,

                      Defendants.

_____

|  |  |
|---|---|
| | REPORT |
| | and |
| | RECOMMENDATION |
| | ---------------------------- |
| | DECISION |
| | and |
| | ORDER |
| | |
| | 20-CV-922JLS(F) |

APPEARANCES:          PHILLIPS NIZER LLP
                              Attorneys for Plaintiff
                              ILENE B. JAROSLAW, of Counsel
                              485 Lexington Avenue
                              14th Floor
                              New York, New York  10017

                              WALSH, ROBERTS & GRACE
                              Attorneys for Defendant Callaghan
                              KEITH N. BOND, of Counsel
                              400 Rand Building
                              14 Lafayette Square
                              Buffalo, New York  14203-1928

                              BURDEN, GULISANO & HANSEN, LLC
                              Attorneys for Defendant Buffalo Skating Club
                              DONNA L. BURDEN, of Counsel
                              605 Brisbane Building
                              403 Main Street
                              Buffalo, New York  14203

                              TYSON & MENDES, LLP
                              Attorneys for Defendant Professional Skaters Assn.
                              DOMINIC M. DONATO, and
                              TINA C. MA, of Counsel
                              370 Lexington Avenue
                              Suite 401
                              New York, New York  10017

and
WILLIAM R. JOHNSON, of Counsel
1616 Westgate Circle
Suite 330
Brentwood, Tennessee  37027

GOLDBERG SEGALLA LLP
Attorneys for Defendant U.S. Figure Skating
MICHAEL E. APPELBAUM, of Counsel
665 Main Street
Suite 400
Buffalo, New York  14203

## JURISDICTION

This case was referred to the undersigned by Honorable Lawrence J. Vilardo[1] on

September 2, 2020, for all pretrial matters including preparation of a report and

recommendation on dispositive motions.  The matter is presently before the court on

motions to dismiss filed by Defendants Professional Skaters Association on September

2, 2020 (Dkt. 13), The United States Figure Skating Association on September 18, 2020

(Dkt. 26), and Buffalo Skating Club, Inc. on October 16, 2020 (Dkt. 33), and on

Defendant Callaghan's motion to set aside default filed November 5, 2020 (Dkt. 38).[2]

## BACKGROUND

In this common law tort claims action before the court pursuant to diversity

jurisdiction, Plaintiff Craig Maurizi ("Plaintiff"), alleges that from 1976 to 1986, beginning

at age 13, Plaintiff suffered sexual abuse by his former figure skating coach, Defendant

Richard Callaghan ("Callaghan"), and that Defendants Buffalo Skating Club, Inc.

---

[1] By Text Order entered September 17, 2020, District Judge Vilardo recused himself from this matter (Dkt. 25), and the case was reassigned on September 18, 2020 to Honorable John L. Sinatra, Jr.

[2] Although the motions to dismiss for failure to state a claim are dispositive, the motion to vacate entry of default is nondispositive, *see DeLee v. Russo*, 2019 WL 3945657, at * 1 (W.D.N.Y. Aug. 21, 2019), *report and recommendation adopted*, 2019 WL 5287929 (W.D.N.Y. Oct. 18, 2019), *reconsideration denied*, 2019 WL 5715646 (W.D.N.Y. Nov. 5, 2019).

("BSC"), Professional Skaters Association ("PSA"), and The United States Figure Skating Association d/b/a U.S. Figure Skating ("USFS") ("Defendant Entities"), knew about the abuse but took no steps to stop the abuse and later failed to properly investigate grievances Plaintiff filed with USFS and PSA regarding the abuse.  Plaintiff asserts nine claims for relief including assault against Callaghan ("First Claim"), aiding and abetting assault against Defendant Entities ("Second Claim"), battery against Callaghan ("Third Claim"), aiding and abetting battery against Defendant Entities ("Fourth Claim"), intentional infliction of emotional distress against Callaghan ("Fifth Claim"), negligent infliction of emotional distress against Callaghan ("Sixth Claim"), negligence against BSC ("Seventh Claim"), negligence against USFS and PSA ("Eighth Claim"), and intentional infliction of emotional distress against USFA and PSA ("Ninth Claim").  All Defendants were served with summons returned executed as to each Defendant on August 7, 2020 (Dkts. 3 ("Callaghan"), 4 (BSC), 5 (PSA), and 6 (USFS)).

On September 2, 2020, PSA filed its motion to dismiss the Complaint (Dkt. 13) ("PSA's Motion"), attaching the Memorandum of Law in Support of Defendant Professional Skaters Association's Motion to Dismiss Complaint [Fed.R.Civ.Proc. 12(b)(6)] (Dkt. 13-1) ("PSA's Memorandum").  Also on September 2, 2020, Plaintiff requested the Clerk of Court enter default as to Callaghan who, despite being served with process on July 28, 2020, had yet to appear in this action.  (Dkt. 15).  Accordingly, on September 3, 2020, default was entered as to Callaghan. (Dkt. 17).

On September 18, 2020, USFS moved to dismiss the Complaint (Dkt. 26) ("USFS's Motion"), attaching the Declaration [of Michael E. Appelbaum, Esq.] in Support of Motion to Dismiss (Dkt. 26-1) ("Appelbaum's Declaration"), and a Memorandum of

Law (Dkt. 26-2) ("USFS's Memorandum").  On September 23, 2020, Plaintiff filed Plaintiff's Opposition to Defendant Professional Skaters Association's Motion to Dismiss (Dkt. 28) ("Plaintiff's Response – PSA").  On October 7, 2020, PSA filed the Memorandum of Law of Defendant Professional Skaters Association's in Reply to Plaintiff's Opposition to Motion to Dismiss Complaint [Fed.R.Civ.P. 12(b)(6) (Dkt.29) ("PSA's Reply").  On October 16, 2020, BSC filed a motion to dismiss the Complaint (Dkt. 33) ("BSC's Motion"), attaching the Attorney Affirmation [of Donna L. Burden, Esq.] in Support of Motion to Dismiss (Dkt. 33-1) ("First Burden Affirmation"), and the Memorandum of Law in Support of the Defendant Buffalo Skating Club, Inc. Motion to Dismiss (Dkt. 33-2) ("BSC's Memorandum").  On November 3, 2020, Plaintiff filed Plaintiff's Opposition to Defendants United States Figure Skating and Buffalo Skating Club's Motions to Dismiss (Dkt. 37) ("Plaintiff's Response – USFS and BSC").

On November 5, 2020, Callaghan filed a motion to set aside entry of default (Dkt. 38) ("Callaghan's Motion"), attaching Defendant's Affidavit in Support of Motion to Set Aside Entry of Default (Dkt. 38-1) ("Callaghan's Affidavit"), the Attorney Declaration [of Keith N. Bond, Esq.] in Support of Motion to Set Aside Entry of Default (Dkt. 38-2) ("Bond Declaration"), exhibits A through C (Dkts. 38-3 through 38-5) ("Callaghan's Exh(s). __"), and the Memorandum of Law in Support of Richard Callaghan's Motion to Set Aside Default (Dkt. 38-6) ("Callaghan's Memorandum").  On November 10, 2020, USFS filed the Reply Declaration [of Michael E. Appelbaum, Esq.] in Support of Motion to Dismiss (Dkt. 39) ("Appelbaum Reply Declaration"), and the Reply Memorandum of Law (Dkt. 39-1) ("USFS's Reply").

On December 30, 2020, Plaintiff filed Plaintiff's Opposition to Defendant Richard Callaghan's Motion to Set Aside His Default (Dkt. 42) ("Plaintiff's Response – Callaghan"), attaching the Declaration of Ilene Jaroslaw[, Esq.] (Dkt. 42-1) ("Jaroslaw Declaration"), with exhibits A through D (Dkts. 42-2 through 42-5) ("Plaintiff's Exh(s). __").[3]  On December 9, 2020, Callaghan filed the Reply Memorandum of Law in Support of Richard Callaghan's Motion to Set Aside Default (Dkt. 45) ("Callaghan's Reply"), attaching exhibits 1 and 2 (Dkts. 45-1 through 45-2) ("Callaghan's Exh(s). __"), and the Attorney Declaration [of Keith N. Bond, Esq.] in Reply to Motion to Set Aside Entry of Default (Dkt. 46) ("Bond Reply Declaration").  On December 10, 2020, BSC filed the Attorney Affirmation [of Donna L. Burden, Esq.] (Dkt. 48) ("Second Burden Affirmation"), attaching exhibits A and B (Dkts. 48-1 and 48-2) ("Second Burden Affirmation Exh(s). __").  Oral argument was deemed unnecessary.

Based on the following, BSC's Motion should be DENIED; PSA's Motion should be GRANTED; USFS's Motion should be GRANTED; the action should be DISMISSED as against Defendants PSA and USFS; alternatively, USFS's request, asserted in USFS's Memorandum in support of USFS's Motion, to strike certain allegations from the Complaint is GRANTED.  Callaghan's Motion to set aside entry of default is GRANTED.

## **FACTS**[4]

As a five-year old child, Plaintiff Craig Maurizi ("Plaintiff" or "Maurizi"), was first enrolled in group figure skating lessons, an activity recommended by his pediatrician to

---

[3] Pursuant to a Text Order (Dkt. 49), granting a motion to seal Plaintiff filed on December 3, 2020 (Dkt. 43), Plaintiff's Exh. C (Dkt. 42-4) was filed under seal on December 11, 2020 (Dkt. 50).  Further, for unexplained reasons, Plaintiff's Response – Callaghan, the Jaroslaw Declaration, and Plaintiff's Exhs. A, B and D were refiled on December 4, 2020 (Dkts. 44 through 44-5).

[4] Taken from the pleadings and motion papers filed in this action.

help correct Plaintiff's inward turning feet.  After three years of group figure skating lessons at Audubon Ice Rink ("the Audubon Rink"), in Amherst, New York, Plaintiff commenced private figure skating lessons with several different coaches over the next five years, each selected by Plaintiff's mother, Jean ("Jean").  In 1976, when Plaintiff was 13 years old, Jean selected as Plaintiff's next coach Defendant Richard Callaghan ("Callaghan"), because Callaghan was the most experienced coach in the area with a reputation for strict discipline.

When selected by Jean to coach Plaintiff, Callaghan was a member of both Defendants United States Figure Skating Association ("USFS"), and Professional Skaters Association ("PSA"), and maintained an office and worked at a skating rink leased by Defendant Buffalo Skating Club ("BSC") ("the ice rink").[5]  Membership in USFS was critical to Jean's selection of Callaghan as Plaintiff's coach because a coach must be a USFS member to participate in USFS-sanctioned competitions, and competing without the guidance and support of a coach is considered a "significant handicap" for a skater.  Complaint ¶ 15.

Membership in USFS requires a coach abide by the organization's rules and Code of Ethics ("USFS Code") which, during the period Callaghan coached Plaintiff, "required [USFS] members to 'exemplify the highest standards of fairness, ethical behavior and genuine good sportsmanship in any of their relations with others.  Any person whose acts, statements or conduct is considered detrimental to the welfare of figure skating is subject to the loss of privilege of registration.'"  Complaint ¶ 16 (quoting USFS Code of Ethics Rule 1.02).  PSA's mission is to raise the level of professionalism

---

[5] Whether the ice rink was the Audubon Rink is not clear from the record.

among figure skating coaches and, similar to USFS, membership requires a coach abide by a Code of Ethics ("PSA Code").  When Plaintiff was coached by Callaghan, the PSA Code provided "Members shall at all times be mindful that he or she has the responsibility to influence his or her student to act with dignity, ethically and with high moral conduct.  The members shall never . . . act in any manner inconsistent with a high standard of ethical and moral conduct."  Complaint ¶ 18.  The PSA Code further provides PSA "members shall take an active role in the prevention of drugs, alcohol and tobacco abuse and under no circumstances should authorize the use of such products." *Id*. ¶ 19.

Plaintiff began competing in figure skating at age 10, and fully committed to the sport in 1977 when, at age 14, Plaintiff broke his ankle while playing on his high school football team only four weeks before a major figure skating competition in which Plaintiff was scheduled to participate.  At that time, Callaghan, who was then coaching Plaintiff, advised Plaintiff that to achieve his dream of becoming a championship figure skater, Plaintiff needed to commit to specializing in figure skating and give up all other sports and other extracurricular activities.  Upon committing to figure skating, Plaintiff trained five to seven hours a day, every day except Sunday, including training at the ice rink for several hours both before and after school Monday through Friday, and for the entire day on Saturday.  Meanwhile, Plaintiff's parents had increasing marital problems that eventually led to their divorce.  As Plaintiff's parents' marital conflicts increased, Plaintiff withdrew from them, ceased speaking with his father whom Plaintiff blamed for the dissolution of the marriage, and found himself providing his mother with emotional support.  The estrangement from his father, and Jean's inability to address her own

emotional needs caused Plaintiff to confide in Callaghan who advised Plaintiff on how to manage his parent's conflict, encouraging Plaintiff to focus on his skating and moving forward with his life. Plaintiff maintains it was during this time that Callaghan perceived Plaintiff's emotional vulnerability and began grooming Plaintiff for sexual abuse. Complaint ¶ 25.

Plaintiff describes Callaghan's sexual abuse began with Callaghan asking questions of a sexual nature including whether Plaintiff ever masturbated which Plaintiff initially denied, but later admitted after Callaghan repeatedly told Plaintiff everyone masturbates. Callaghan escalated his abuse of Plaintiff by showing Plaintiff pornographic magazines and asking if viewing them gave Plaintiff an erection, grabbing Plaintiff's genitals to see if Plaintiff had an erection, showing Plaintiff through his pants when Callaghan had an erection, and eventually masturbating in front of Plaintiff while encouraging Plaintiff to do likewise. In 1978, when Plaintiff was 15, his parents' divorce was finalized and Plaintiff became increasingly emotionally dependent on Callaghan whom Plaintiff considered to be the only person Plaintiff could trust. Having gained Plaintiff's trust and conditioned Plaintiff to normalize the sexual abuse, Callaghan introduced new tactics including encouraging Plaintiff to drink beer Callaghan kept in a refrigerator in his office at the ice rink. Plaintiff began thinking Callaghan's treatment of him indicated Plaintiff was "special" and Plaintiff "developed a fierce loyalty to Callaghan," Complaint ¶ 31, which loyalty Callaghan exploited by further escalating sexual demands. According to Plaintiff, "psychological consequences of the abuse started to emerge," *id*. ¶ 32, with which Plaintiff coped by using marijuana and LSD. Callaghan encouraged Plaintiff to consume more alcohol which made Plaintiff more

susceptible to Callaghan's abuse, and Callaghan also pressured Plaintiff about losing weight and instituted daily weigh-ins. Seeking to please Callaghan, Plaintiff responded by engaging in bulimic behavior and developed an eating disorder.

Purportedly to provide Plaintiff with an escape from his family's disharmony, Callaghan began having Plaintiff spend time with Callaghan's family, including having Plaintiff babysit Callaghan's daughter and accompanying them on outings including to golf. As Plaintiff interacted more with Callaghan's family, Callaghan also increased his sexual demands of Plaintiff. In particular, when Plaintiff turned 16, Callaghan began demanding Plaintiff perform oral sex, demands with which Plaintiff was afraid to refuse to comply. Callaghan often provided Plaintiff with alcohol prior to engaging in such abuse of Plaintiff which usually occurred at the ice rink and of which Plaintiff maintains members of Defendant Entities were aware. Callaghan then began taking Plaintiff to bars where Callaghan encouraged Plaintiff's increased alcohol consumption to facilitate Plaintiff acceding to Callahan's increasing sexual demands. Plaintiff's increased alcohol consumption made it difficult for Plaintiff to maintain a desirable weight for competitive skating and Plaintiff resorted to bulimic behavior including vomiting prior to his weigh-ins. Although Callaghan was aware of Plaintiff's bulimic behavior, Callaghan did nothing to help Plaintiff manage his weight. Plaintiff also began using marijuana two or three times a week, Plaintiff maintains numerous members of USFS and PSA were aware that Callaghan was providing Plaintiff with alcohol and taking Plaintiff to bars to consume alcohol.

At the end of the 1980 figure skating competition season, Callaghan was "pushed out" of BSC, allegedly because of rumors that Callaghan was abusing male figure

skaters including Plaintiff. BSC did not make an official report regarding Callaghan with

USFS, PSA, or local law enforcement; rather, BSC "foisted" Callaghan upon the

Philadelphia Skating Club and Humane Society in Philadelphia, Pennsylvania ("PSC").[6]

Complaint ¶¶ 40-41. To continue training with Callaghan, Plaintiff moved to

Philadelphia where Plaintiff leased an apartment; Plaintiff's apartment provided more

privacy and the sexual activity with Callaghan "dramatically increased" with Callaghan

going to Plaintiff's apartment three times a week to engage in sexual activity. *Id*. ¶ 42.

Callaghan continued to encourage Plaintiff's excessive consumption of alcohol and

brought Plaintiff to bars in New Jersey where the drinking age then was lower than in

Pennsylvania,[7] as well as to strip clubs. As the sexual abuse and alcohol consumption

increased, so did Plaintiff's bulimia and living in an apartment provided Plaintiff with the

privacy to binge on food and purge, with Plaintiff consuming large quantities of food and

subsequently vomiting. Plaintiff then consumed large quantities of caffeine and diet pills

with a stimulant effect to ensure Plaintiff was alert and energetic for skating practice. In

1982, Plaintiff was arrested for underage drinking. After paying Plaintiff's bail,

Callaghan insisted Plaintiff give up his apartment and move in with Callaghan, Plaintiff

complied and the sexual abuse continued for several more years with Callaghan

becoming ever more controlling of Plaintiff.

---

[6] The Complaint does not explain how BSC "foisted" Callaghan upon the PSC.

[7] The court takes judicial notice that the age at which alcohol is permitted to be consumed ("drinking age") in New Jersey was raised from 18 to 19 in 1980 and then to 21 as of January 1, 1983, N.J. Stat. Ann. § 9:17B-1(b) (1982); whereas Pennsylvania's drinking age has been 21 since at least 1939.  18 PA. Cons. Stat. § 6309(a) (2018) & Comment – 1967.  *See* Fed.R.Evid. Rule 201(b) (permitting judicial notice to be taken of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

In 1985, Plaintiff began dating women and Callaghan responded with jealousy, including going to the home of one of Plaintiff's girlfriends where Callaghan banged on the front door, cursing and screaming for Plaintiff to come out, and only leaving upon realizing Plaintiff was not going to leave with Callaghan. Because Callaghan continued following Plaintiff, Plaintiff began lying about where he was going and with whom he was spending time.

On Plaintiff's 23rd birthday, Plaintiff finally told Callaghan he no longer wanted to engage in sexual activity with Callaghan, especially with Callaghan's wife and daughter sleeping down the hall, and Callaghan reluctantly agreed. In 1986, Plaintiff moved with Callaghan to Colorado Springs, Colorado to train at Broadmoor World Arena. Plaintiff rented his own apartment, and Callaghan's sexual abuse largely stopped, but Plaintiff's bulimia grew worse with Plaintiff binging and purging every day. Although Plaintiff continued to try to separate himself from Callaghan, the two still went drinking together with Callaghan seizing upon the opportunity to initiate sex and trying to grab Plaintiff's genitals, but Plaintiff refused and rebuffed him. The more Plaintiff rebuffed Callaghan, the more obsessed Callaghan became with Plaintiff's social activities, frequently driving to Plaintiff's apartment to see what Plaintiff was doing. If Callaghan found Plaintiff with a woman in his apartment, Callaghan exploded with rage and screamed to be let in. Callaghan called one of Plaintiff's female friends a "whore," and camped outside Plaintiffs' apartment for an entire night to see when Plaintiff's girlfriend left.

Plaintiff finally quit competitive skating in December 1987, yet worked as Callaghan's assistant coach at San Diego Ice Arena for several more years. In 1989, Plaintiff met his future wife. Callaghan did not interfere in the relationship, and Plaintiff

married in 1991.  Plaintiff and his wife then moved to St. Clair Shores, Michigan, where Plaintiff was Skating Director of the St. Clair Shores Figure Skating Club until April 1992 when Plaintiff and his wife moved to Omaha, Nebraska, where Plaintiff became Director of Skating at the Figure Skating Club of Omaha.  For the next few years, Plaintiff's only contact with Callaghan was when they saw each other at various skating competitions.

In February 1995, Callaghan contacted Plaintiff three times inquiring whether Plaintiff would become Callaghan's assistant at the Detroit Skating Club in Michigan ("DSC"), the premier figure skating training center in the United States.  At that time, Callaghan was training Nicole Bobek, the 1995 Ladies' Singles National Champion and World Championship's bronze medalist, as well as Todd Eldridge, the 1995 Men's Singles National Championship and World Championship silver medalist.  Working as Callaghan's assistant in training such high caliber talent was likely to significantly advance Plaintiff's own coaching career.  Although Plaintiff initially rejected the offer, his wife, to whom Plaintiff had never been able to explain about the years of abuse Callaghan inflicted on Plaintiff, did not understand why Plaintiff refused the opportunity, and Plaintiff felt he had no choice but to accept the offer.  In September 1995, Plaintiff and his wife moved to Bloomfield Hills, Michigan and Plaintiff commenced working as Callaghan's assistant coach at DSC.

Plaintiff soon began again experiencing Callaghan's manipulation and control and felt conflicted as the feelings of devotion and loyalty toward Callahan that had enabled the years of abuse resurfaced, while Plaintiff became angry at Callaghan's attempts to intimidate him and belittle Plaintiff's coaching.  The end of Plaintiff's professional relationship with Callaghan involved a dispute over a young, female skater

Plaintiff recruited to train at DSC.  The skater's parents accused Callaghan of not investing enough time and effort in training their daughter as compared to other skaters, yet Callaghan sought to control the skater's every movement.  Because of the conflict between the skater's parents and Callaghan, Plaintiff's role in her training increased and the skater's parents eventually asked Plaintiff to be their daughter's main coach, which infuriated Callaghan who forbade Plaintiff to even speak with the parents.  After the 1998 Winter Olympics, the skater's parents fired Callaghan and hired Plaintiff to coach their daughter.  Callaghan was furious with Plaintiff, accused Plaintiff of stealing the skater from him, and refused to speak with Plaintiff.  Plaintiff was angered by Callaghan's treatment, especially given the Plaintiff's loyalty to Callaghan despite rampant rumors of the manipulation and abuse Plaintiff suffered at the hands of Callaghan, all of which were true.  With the irreparable rift between Plaintiff and Callaghan, Plaintiff broke free of Callaghan's control.

    Plaintiff then became determined to protect other skaters from Callaghan and in April 1999, Plaintiff publicly revealed the years of abuse he endured from Callaghan, filing with USFS an ethics complaint or "grievance" against Callaghan ("USFS grievance").  When the USFS grievance was filed, Callaghan's longtime friend and confidante James Disbrow ("Disbrow"),[8] was USFS's President.  Plaintiff maintains that during his own coaching career, Disbrow had sexual relationships with male skaters, and allowing Callaghan's abuse of Plaintiff to become known was likely to result in Disbrow's own implication in engaging in similarly abusive behavior.  To "bury" Plaintiff's

---

[8] According to Plaintiff, as young skaters in Buffalo, New York, both Callaghan and Disbrow trained under the same coach who eventually adopted Disbrow and in 2004 was permanently banned from membership in the USFS after being convicted of sexually abusing one of his skaters.  Complaint ¶ 67 & n 3.

USFS grievance, Disbrow first removed Steven Hazen ("Hazen"), from his position as USFS Grievance Committee Chair (Grievance Chair"), a move Hazen considered intended to interfere with the grievance process so as to intimidate Hazen into abandoning his duty to investigate Plaintiff's grievance. Hazen was instructed to forward all materials he collected regarding the USFS grievance to the USFS Ethics Committee Chair, advising the matter would be sent to the USFS Grievance Committee which would empanel a three-person commission for an investigation into the validity of the USFS grievance's claims. Although Disbrow was expected to appoint a new Grievance Committee Chair, rather than doing so, Disbrow rendered a decision on the USFS grievance, dismissing the grievance as untimely because it was not filed within 60 days of the alleged violation or its discovery as USFS bylaws required.

Also in 1999,[9] Plaintiff filed a grievance with PSA ("PSA grievance"), in an attempt to have Callaghan's coaching credentials revoked. At that time, PSA's president was Jerry Lane ("Lane"), another childhood friend of Callaghan. Plaintiff maintains Callaghan selected a committee of three coaches ("three-coach committee"), the identities of whom were never provided to Plaintiff, to hear the PSA grievance. Based solely on written submissions from Plaintiff and Callaghan, without interviewing Plaintiff or conducting any factual investigation of Plaintiff's allegations, the three-coach committee unanimously found no violation of PSA's ethics standards with regard to Plaintiff's claims.

---

[9] The exact date is not provided in the record.

In January 2018, Plaintiff filed a complaint about Callaghan's abuse with U.S. Center for SafeSport ("SafeSport")[10] ("SafeSport Complaint"). The SafeSport Complaint was the same the same grievance Plaintiff previously filed with USFS and PSA. On March 8, 2018, SafeSport and USFS issued a preliminary order barring Callaghan from all USFS-sanctioned events. On August 21, 2019, following an extensive 18-month investigation, SafeSport ruled Callaghan was permanently ineligible from participating in USFS-sanctioned events because of sexual misconduct involving a minor. In compliance with SafeSport's finding, USFS also permanently banned Callaghan from membership. Callaghan appealed the permanent suspensions through SafeSport's arbitration process and on December 16, 2019, the arbitrator modified the order by, *inter alia*, reducing the penalties to a three-year suspension, 15-year probation, and 100 hours community service. Arbitration Decision[11] at 24-25.

On February 14, 2019, the Child Victims Act ("CVA") was signed into New York law, N.Y. Civ.Prac.L.&R. § 214-g, providing, *inter alia*, a one-year window, from August 14, 2019 through August 14, 2020, in which survivors of childhood sexual abuse could bring legal actions against their abusers and the organizations or persons that could have, but failed, to take any action to stop or prevent the abuse. During the one-year window, Plaintiff filed the instant action on July 20, 2020.

Meanwhile, in January 2020, Callaghan filed for bankruptcy. Plaintiff maintains Callaghan filed for bankruptcy while another child sexual abuse action was pending against Callaghan in California. In connection with bankruptcy proceeding, Callaghan

---

[10] As explained below, Discussion, *infra*, at 21-22, SafeSport is the entity charged by the USOC with investigating misconduct claims related to amateur sports in the United States.

[11] Filed under seal as Dkt. 50.

did not list Plaintiff as a potential creditor despite knowledge, based on the USFS and PSA grievances, that Plaintiff had a potential claim against him, nor did Callaghan provide Plaintiff with notice of the bankruptcy. Callahan's bankruptcy proceeding was dismissed in May 2020.

## **DISCUSSION**

### 1.    **Setting Aside Entry of Default**

Defendant Callaghan moves to have set aside the court's entry of default on September 3, 2020, arguing the action should be decided on the merits, Callaghan's Memorandum at 2-3, and there is good cause to vacate the entry of default because the default was not willful, *id*. at 3-5, vacating the default will not result in any prejudice to Plaintiff, *id*. at 5, and Callaghan has a meritorious defense to Plaintiff's claims. *Id*. at 5-6. In opposition, Plaintiff argues the findings of the SafeSport Arbitration Decision collaterally estops Callaghan from defending the instant action, Plaintiff's Response – Callaghan at 2-4, maintains Callaghan's default was willful, *id*. at 4-6, and asserts Plaintiff would be prejudiced if the default is vacated. *Id*. at 6-7. In further support of vacating entry of default, Callaghan argues the SafeSport Arbitration Decision does not collaterally estop Plaintiff from defending this action, Callaghan's Reply at 2-5, and reiterates the default was not willful, *id*. at 5-6, and that Plaintiff will not be prejudiced by vacating the default. *Id*. at 6-8.

Under Rule 55(a) of the Federal Rules of Civil Procedure ("Rule 55(___)"), "when a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend . . ., the clerk must enter the party's default." Entry of default is mandatory, not discretionary. *See Bricklayers & Allied Craftworkers Local 2, Albany,*

*N.Y. Pension Fund v. Moulton Masonry & Const., LLC*, 779 F.3d 182, 186 (2d Cir. 2015).  Once default has been entered, Rule 55(c) provides that "[t]he court may set aside an entry of default for good cause."  The standard for good cause "requires a court to weigh (1) the willfulness of default, (2) the existence of any meritorious defenses, and (3) prejudice to the non-defaulting party."  *Guggenheim Capital, LLC v. Birnbaum*, 722 F.3d 444, 455 (2d Cir. 2013).  Further, it is within the district court's discretion to vacate an entry of default.  *See Thomas v. Martin-Gibbons*, 857 Fed.Appx. 36, 37 (2d Cir. 2021) (reviewing district court's vacating entry of default for abuse of discretion) (citing *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95 (2d Cir. 1993)).  *See Puerner v. Hudson Spine & Pain Med., P.C.,* 2019 WL 2548134, at *2 (S.D.N.Y. June 19, 2019) ("The Court enjoys sound discretion in applying these factors, but must acknowledge the strong preference to resolve disputes on the merits." (*citing New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005))).  In the instant case, consideration of the relevant factors supports vacating the entry of default.

### A.    Willfulness

With regard to the first factor, Callaghan attributes his failure to file an answer or to otherwise appear in this action initially to confusion as to whether Callaghan's bankruptcy action protected Callaghan from liability on the claim, Callaghan's Memorandum at 4, that Callaghan's recent health issues, including undergoing since January 2018 five surgeries and lengthy hospital stays, have complicated Callaghan's financial situation and rendered Callaghan without funds to retain legal counsel in in this matter, *id*., and Callaghan was unaware until after default was entered that insurance coverage was available through which Callaghan could obtain legal counsel.  *Id*. at 4-5.

In opposing Callaghan's Motion, Plaintiff argues the willfulness of Callaghan's default is evident by Callaghan's failure to include Plaintiff on the schedule of contingent creditors filed in connection with Callaghan's bankruptcy action or to provide Plaintiff with notice of the bankruptcy proceeding.  Plaintiff's Response – Callaghan at 4-5.  Plaintiff further characterizes as disingenuous a letter received from Callaghan's bankruptcy attorney, Brian D. Zinn, Esq. ("Zinn"), on August 17, 2020, *i.e.*, the day before the deadline for Callaghan to file a responsive pleading, advising that if Plaintiff was aware, prior to commencing the instant action of Callaghan's bankruptcy filing ("Zinn Letter") (Dkt. 38-3), Plaintiff, by naming Callaghan as a defendant to this action, would be in violation of the bankruptcy discharge injunction.[12]  Plaintiff's Response – Callaghan at 5.  According to Plaintiff, the August 18, 2020 letter by Plaintiff's counsel, Ilene Jaroslaw to Zinn ("Jaroslaw Letter") (Dkt. 38-4), advising that Callaghan's alleged conduct toward Plaintiff "was willful and malicious under 11 U.S.C. § 523(a)(6)," and renders the potential debt arising from this action "nondischargeable," placed Callaghan on notice such that Callaghan's failure to timely file a responsive pleading or otherwise respond was done with both knowledge and willfulness.  *Id*. at 5-6.  In further support of setting aside default, Callaghan reiterates that his default was not willful, but is properly attributed to confusion over his bankruptcy proceeding, a lack of financial resources, and poor health, and that upon learning he was entitled to a defense pursuant to an insurance

---

[12] A so-called "bankruptcy discharge," according to § 524(a)(2) of the Bankruptcy Code, "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived." 11 U.S.C. § 524(a)(2).

policy and, thus, would not need to pay for an attorney, Callaghan expressed an interest in defending this action.  Callaghan's Reply at 5-6.

In the context of default, willfulness is "conduct that is more than merely negligent or careless."  *S.E.C. v. McNulty*, 137 F.3d 732, 738 (2d Cir. 1998), *cert. denied*, 525 U.S. 931 (1998).  Even gross negligence, which may weigh against the defaulting party, does not necessarily preclude relief.  *American Alliance Ins. Co. v. Eagle Ins. Co.*, 92 F.3d 57, 61 (2d Cir. 1996).  A determination of willfulness is appropriate "where the conduct of counsel or the litigant was egregious and was not satisfactorily explained."  *McNulty*, 137 F.3d at 738.  A default that is attributed to more than negligence, such as "bad faith" evidenced by a strategic decision to ignore the litigation, is willful.  *American Alliance Ins. Co.*, 92 F.3d at 61.  In the instant case, Callahan's failure to timely answer or to otherwise appear in this action cannot be attributed to anything other than, at most, gross negligence.

Significantly, not only has Callaghan attributed his delay in responding to the Complaint to undisclosed health issues, which Plaintiff does not dispute, but also to his financial situation, including bankruptcy, such that Callaghan lacked the funds necessary to retain an attorney to represent him in this action.  Callaghan learned that default was entered against him after receiving from Plaintiff's counsel a letter dated September 2, 2020.  Bond Declaration ¶ 8.  Thereafter, Callaghan was advised by Carrie E. Cope, Esq., of the Cope Law Firm, by letter dated October 1, 2020 of the existence of an insurance policy issued by Philadelphia Indemnity Insurance Company ("PIIC"), issued to BSC through which Callaghan would be covered as an insured with regard to the instant action (Dkt. 38-5) ("coverage letter").  *Id*. ¶ 9.  On October 14,

2020, after consulting with Dean J. Groulx, Esq ("Groulx"), the attorney who represented Callaghan in the SafeSport arbitration, regarding the coverage letter, Callaghan tendered defense of this claim to PIIC.  *Id*. ¶ 10.  On October 14, 2020, PIIC contacted Bond, requesting Bond appear for and defend Callaghan in this action, following which Bond spoke with Groulx on October 16, 2020, and also spoke with Callaghan who agreed to accept PIIC's selection of Bond to defend Callaghan in this action.  *Id*. ¶ 11. On October 23, 2020, Bond received from Callaghan a signed acknowledgment and "waiver"[13] agreeing to Bond's representation in this action as assigned by PIIC.  *Id*. ¶ 13.  That same day, Bond filed a Notice of Appearance in this action on Callaghan's behalf.  *Id*. ¶ 14.  On October 26, 2020, Bond received an e-mail from Plaintiff's counsel advising Plaintiff was opposed to setting aside entry of default, and Callaghan filed the instant motion on November 5, 2020.[14]  *Id*. ¶¶ 14-15.  These circumstances, undisputed by Plaintiff, strongly support Callaghan's assertion of his default to an inability to retain counsel, a determination that is further supported by the alacrity with which Callaghan responded upon learning of the insurance coverage through PIIC that would allow Callaghan to retain counsel.  Accordingly, this factor weighs in favor of setting aside the default.

### B.    Meritorious Defense

The second factor requiring the existence of meritorious defenses also weighs in Callaghan's favor.  A "defendant seeking to vacate an entry of default must present some evidence beyond conclusory denials to support his defense," *Enron Oil Corp.*, 713

---

[13] The precise nature of the "waiver" is not in the record.
[14] The court notes Plaintiff does not argue Callaghan's failure to promptly investigate the availability of insurance coverage for counsel justifies denying the motion to set aside the default.

F.2d at 98, and evidence of facts which, if proven at trial, would constitute a complete defense will suffice. *McNulty*, 137 F.3d at 740.  Here, Callaghan initially asserts a defense consisting of a general denial of Plaintiff's claims.  Callaghan's Memorandum at 5-6.  In opposition, Plaintiff maintains the findings of the SafeSport arbitration proceeding collaterally estop Callaghan from presenting a defense in the instant action. Plaintiff's Response – Callaghan at 2-4.  In addition to his conclusory denial and in rebuttal to Plaintiff's reliance on the SafeSport Arbitration Decision, in further support of his motion to set aside the default, Callaghan argues the SafeSport Arbitration Decision is not in an admissible form and is based on inadmissible hearsay including, *inter alia*, a newspaper article, Callaghan's Reply at 2 and 4, this court should not even consider the SafeSport Arbitration Decision which SafeSport's own rules provide is subject to strict confidentiality requiring the document remain confidential, *id*. at 3, the SafeSport Arbitration Decision includes discussions of alleged conduct by Callaghan against two additional skaters who are not parties to this action, *id*. at 3-4, and that Plaintiff, prior to commencing the SafeSport arbitration proceeding, filed two grievances including one with the USFS which was dismissed as untimely, and another with the PSA which was dismissed by an empaneled committee of three impartial arbitrators as unsupported by an investigation that included review of numerous witness statements, polygraph examinations, and internet posts.  *Id*. at 4-5.

Preliminarily, insofar as Callaghan relies on the conflicting resolutions of the USFS grievance, which was dismissed as untimely filed, and the PSA grievance, which found Plaintiff's claims without merit, a favorable determination may be admissible in a judicial proceeding.  *LeRoy v. Amedisys Holding LLC*, 2022 WL 394568, at *6

(W.D.N.Y. Feb. 9, 2022) (citing *Adeniji v. New York State Off. of State Comptroller*, ⎯⎯ F.Supp.3d ⎯⎯; 2021 WL 3911373, at *7 (S.D.N.Y. Aug. 31, 2021) (finding magistrate judge, in broadly assessing the evidence, properly considered NYDHR's no probable cause finding, following NYDHR's investigation, as one of multiple factors undermining the plaintiff's claim of discrimination based on the defendant's failure to hire (citing *Cortes v. MTA New York City Transit*, 802 F.3d 226, 232 (2d Cir. 2015)) ("The unreviewed findings of an agency are ... admissible as evidence under Fed.R.Evid. 803(8)(A)(iii) as 'factual findings from a legally authorized investigation' by a public office." (quoting Federal Rules of Evidence 803(8)(A)(iii)))).  Whether Callaghan has a meritorious defense to Plaintiff's claims against him thus turns on whether Callaghan is collaterally estopped by the SafeSport Arbitration Decision.

Relevant here, SafeSport is a non-profit corporation chartered by the U.S. Olympic Committee ("USOC") in 2017 and designated in 2018 "as the independent national safe sport organization for the United States," 26 U.S.C. § 220541(a)(1), through the adoption of Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017, as an amendment to the Amateur Sports Act of 1978, 36 U.S.C. § 220501, *et seq*. ("Safe Sport Act" or "the Act")).  As such, SafeSport, under the Act, has "exclusive authority" in investigating and adjudicating "actual and suspected sexual misconduct" by, *inter alia*, coaches against amateur athletes in sports throughout the United States, and, when violations of the Act are found, imposing sanctions for such violations.  36 U.S.C. § 220541(a)(2).  Under the Act, the USOC selects a national governing body ("NGB") for each amateur sport and recognizes USFS as the NGB for ice figure skating in the United States.  36 U.S.C. § 220521(a).  Accordingly, USOC and

each NGB, here, USFS, honor and enforce SafeSport's findings and sanctions against the members of their organizations, 36 U.S.C. § 220521(a)(2), including the SafeSport Arbitration Decision, *see* Dkt. 50.

Because Plaintiff's claims are before the court under diversity jurisdiction, the court applies the doctrine of collateral estoppel according to New York law.  *See BBS Norwalk One, Inc. v. Raccolta, Inc*., 117 F.3d 674, 677 (2d Cir. 1997) ("The governing law in this diversity case is that of New York, where the district court sits: specifically, New York's law on the collateral estoppel effect of an arbitration award.").  "Under either federal law or New York State law, collateral estoppel, or issue preclusion, bars the relitigation of an issue that was raised, litigated, and actually decided by a judgment in a prior proceeding, regardless of whether the two suits are based on the same cause of action."  *Postlewaite v. McGraw-Hill*, 333 F.3d 42, 48 (2d Cir. 2003) (citing *Lawlor v. National Screen Service Corp.,* 349 U.S. 322, 326 (1955); *Capital Telephone Co. v. Pattersonville Telephone Co.,* 436 N.E.2d 461, 463 (N.Y. 1982); and 18 Moore's Federal Practice § 132.01[2] (3d ed. 2003) ("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination—even if erroneous—is conclusive in a subsequent action between the parties, whether on the same or a different claim.").

"Under New York law, the doctrine of collateral estoppel 'precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same.'"  *Burgos v. Hopkins*, 14 F.3d 787, 792 (2d Cir. 1994) (quoting *Ryan v. New York Telephone Co.,* 467 N.E.2d 487, 490 (N.Y. 1984).

"There are two requirements for the application of collateral estoppel to an issue: (1) '[t]here must be an identity of issue which has necessarily been decided in the prior action and is decisive of the present action,' and (2) 'there must have been a full and fair opportunity to contest the decision now said to be controlling.'" *Id*. (quoting *Schwartz v. Public Administrator,* 246 N.E.2d 725, 729 (N.Y. 1969)).

"[F]or a judgment to be preclusive, the issue in question must have been actually decided, and its determination must have been essential to the judgment." *Postlewaite*, 333 F.3d at 48 (citing *Tucker v. Arthur Andersen & Co.,* 646 F.2d 721, 728 (2d Cir.1981)). Critical to the instant case, "[i]If an issue was not actually decided in the prior proceeding, or if its resolution was not necessary to the judgment, its litigation in a subsequent proceeding is not barred by collateral estoppel." *Id*. (citing *Brown v. Felsen,* 442 U.S. 127, 139 n. 10 (1979); *Jim Beam Brands Co. v. Beamish & Crawford Ltd.,* 937 F.2d 729, 734 (2d Cir.1991), *cert. denied,* 502 U.S. 1094 (1992); and *Balderman v. United States Veterans Administration,* 870 F.2d 57, 62 (2d Cir.1989). "The prior decision of the issue need not have been explicit, however, "[i]f by necessary implication it is contained in that [decision] which has been explicitly decided." *Id*. (citing *Norris v. Grosvenor Marketing Ltd.,* 803 F.2d 1281, 1285 (2d Cir.1986) (internal quotation marks omitted)). "If the decision was implicitly necessary, 'it will be the basis for collateral estoppel.'" *Id.* (quoting *Norris*, 803 F.2d at 1285 (internal quotation marks omitted)).

Under New York law as it has evolved, collateral estoppel may also be applied, assuming there has been a final determination on the merits, to an issue resolved in arbitration. *Postlewaite*, 333 F.3d at 48 (citing *Jacobson v. Fireman's Fund Ins. Co.*, 111 F.3d 261, 267-68 (2d Cir. 1997) ("[R]es judicata and collateral estoppel apply to

issues resolved by arbitration where there has been a final determination on the merits, notwithstanding a lack of confirmation of the award" under New York law.)). "Further, given 'the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation,' judicial review of arbitration is very limited." *Id*. at 49 (quoting *Folkways Music Publishers, Inc. v. Weiss,* 989 F.2d 108, 111 (2d Cir.1993)). "'[T]he party asserting preclusion bears the burden of showing *with clarity and certainty* what was determined by the prior judgment," and "[i]ssue preclusion will apply only if it is *quite clear* that this requirement has been met.'" *Id*. (quoting *BBS Norwalk One, Inc. v. Raccolta, Inc.,* 117 F.3d 674, 677 (2d Cir.1997) (internal quotation marks omitted) (italics added)). In the instant case, Plaintiff's claims against Callaghan are not barred by collateral estoppel because the SafeSport Arbitration Decision did not actually decide the issues with regard to Callaghan raised by Plaintiff in the instant case, nor were the findings made with regard to Callaghan essential to the Arbitration Decision.

In particular, the Arbitration Decision addressed not only the claims Plaintiff asserted against Callaghan in the SafeSport Complaint, but also similar claims made by two female skaters who were coached by Callaghan ("the female complainants").[15] Arbitration Decision at 4. Although Callaghan was found to have engaged in conduct in violation of the Safe Sport Act for which sanctions were imposed, a comparison of the Arbitration Decision and Plaintiff's SafeSport Complaint claims, indicates the violations and sanctions were limited to the complaints filed by the female skaters, and did not include Plaintiff's SafeSport Complaint claims. Arbitration Decision at 20-21, 23-25. After considering SafeSport's evidence submitted in support of Plaintiff's SafeSport

---

[15] The names and other identifying information of the female complaints are redacted in the Arbitration Decision filed under seal.

Complaint, the arbitrator agreed that Plaintiff's testimony confirmed Plaintiff, while a minor being coached by Callaghan, was sexually abused by Callaghan, and found "Callaghan's actions deplorable and unbecoming of a coach in the Olympic movement. *Id*. at 17-18.  In making this finding, the arbitrator accepted Plaintiff's version of the relationship which included allegations of Callaghan exploiting Plaintiff's troubled home life to gain Plaintiff's trust which facilitated Callaghan's abuse, over Callaghan's version which included that the relationship was solely professional and that Plaintiff's claims of abuse were intended to discredit Callaghan and allow Plaintiff to steal Callaghan's pupils.  *Id*. at 14-16.  Nevertheless, because Callaghan's alleged abuse of Plaintiff as a minor occurred before such conduct was prohibited under SafeSport's Code was enacted following the adoption of the Safe Sport Act in 2018, the arbitrator was required to find the conduct at issue violated "other standards accepted at the time of conduct analogous to prohibited conduct in this *Code*."  *Id*. at 16 (italics in original) (quoting SafeSport *Code* at § II(U)(c)).[16]  The "other standards" on which SafeSport relied in the Arbitration Decision were N.Y. Penal Law §§ 130.40 (Criminal Sexual Act in the Third Degree (oral or anal sexual conduct with victim younger than 17 years old)) and 130.55 (Sexual Abuse in the Third Degree (sexual contact with victim younger than 17 years old)).  When Callaghan allegedly violated these criminal provisions, however, New York law required corroboration for sexual offenses where lack of capacity of consent, including based on the victim's mental defect, mental incapacity, or age, is an element of the offense.  *Id*. at 16 (citing N.Y. Penal Law § 130.16).  Absent such corroboration, "the evidence cannot be 'legally sufficient to establish the offense charged.'"  *Id*. at 17

---

[16] No copy of the *Code* is in the record.

(quoting *People v. Ahlers*, 470 N.Y.S.3d 483, 485 (3rd Dept. 1983)).  *See Faulkner v. Nat'l Geographic Enters., Inc.*, 409 F.3d 26, 37 (2d Cir. 2005) ("Use of collateral estoppel 'must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged.'" (quoting *Comm'r v. Sunnen*, 333 US. 591, 599-600 (1948))).  Because according to the Arbitration Decision, SafeSport presented no evidence corroborating Plaintiff's claims of abuse asserted against Callaghan, the arbitrator found she was constrained to find Callaghan did not violate New York law in effect at the time of the alleged conduct, *i.e.*, the "other standards" as required by SafeSport *Code* § II(U)(c), and the Arbitration Decision did not "hinge" on the unlawful conduct Callaghan allegedly perpetrated against Plaintiff such that Plaintiff's claims against Callaghan were not "necessary or essential" to the final Arbitration Decision, *Biflock v. Philip Morris USA Inc.*, 936 F.3d 74, 81 (2d Cir. 2019) (quotation omitted), and thus no determination with respect to Plaintiff's claims in the instant were reached in the Arbitration Decision.

Accordingly, the Arbitration Decision is not a final decision with respect to Plaintiff's claims for purposes of giving it collateral estoppel effect in the instant action, Thus, Callaghan's assertions of the favorable disposition on the PSA grievance is a non-conclusory defense sufficient to vacate a default, and the second factor, *i.e.*, availability of a meritorious defenses, weighs in favor of Callaghan.

### C.     Prejudice

With respect to the third factor, Callaghan maintains Plaintiff would not be prejudiced by vacating the default by the delay between the entry of default and

Callaghan's filing of the instant motion.  Callaghan's Memorandum at 5.  According to Callaghan, Plaintiff cannot demonstrate how the two-month delay will result in the loss of evidence, or lead to difficulties with discovery.  *Id*.  In opposition, Plaintiff argues vacating Callahan's default will result in prejudice because Plaintiff has waited more than 30 years for Callaghan to be held accountable for harm, including financial compensation, caused by years of abusing Plaintiff.  Plaintiff's Response – Callaghan at 6-7.  In further support of setting aside default, Callaghan asserts Plaintiff's opposition to the motion is merely a conclusory statement providing no specifics establishing prejudice.  Callaghan's Reply at 6-8.

"[D]elay alone is not a sufficient basis for establishing prejudice."  *Davis v. Musler*, 713 F.2d 907, 916 (2d Cir. 1983).  Instead, it must be established that the delay has caused the loss of evidence or created increased difficulties in discovery, or provided increased opportunity for fraud and collusion. *Id.*  Accordingly, Plaintiff's argument that because he has already waited more than 30 years for justice, any further delay, including delay attributed to setting aside the entry of default, would be unduly prejudicial to Plaintiff is insufficient to avoid vacating the entry of default.

Because all three factors weigh in favor of vacating default, and in light of the Second Circuit's preference that actions be decided on their merits, *Powerserve Int'l, Inc. v. Lavi*, 239 F.3d 508, 514 (2d Cir. 2001), Callaghan's Motion is GRANTED.

## 2.    Motions to Dismiss

Each of the Defendant Entities separately moves pursuant to Fed.R.Civ.P. 12(b)(6) ("Rule 12(b)(6)") to dismiss the Complaint for failure to state a claim for which relief can be granted.  A complaint must be dismissed pursuant to Rule 12(b)(6) for

failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (rejecting longstanding precedent of *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). As such, the Supreme Court requires application of "a 'plausibility standard....'" *Harris v. Mills*, 572 F.3d 66, 71-72 (2d Cir. 2009) (citing *Twombly*, 550 U.S. at 570, and quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). On a motion to dismiss under Rule 12(b)(6), the court looks to the four corners of the complaint and is required to accept the plaintiff's allegations as true and to construe those allegations in the light most favorable to the plaintiff. *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008) (court is required to liberally construe the complaint, accept as true all factual allegations in the complaint, and draw all reasonable inferences in the plaintiff's favor). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id*. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."' *Id*. (quoting *Twombly*, 550 U.S. at 557)

A Rule 12(b)(6) motion is addressed to the face of the pleading.  "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the [pleading], documents attached to the [pleading] as exhibits, and documents incorporated by reference in the [pleading]."  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).  A court should consider the motion by "accepting all factual allegations as true and drawing all reasonable inferences in favor of the [claimant]."  *Trustees of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).  "While a [pleading] attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a [claimant]'s obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted).

Although each of the Defendant Entities separately moves pursuant to Rule 12(b)(6) to dismiss the Complaint, Plaintiff has already conceded to dismissing all the claims alleged against Defendant PSA except for the Ninth Claim alleging intentional infliction of emotional distress.  Plaintiff's Response – PSA at 8.  Accordingly, the claims for which dismissal is sought include the Second Claim alleging Defendants USFS and BSC aided and abetted Callaghan in assaulting Plaintiff, the Fourth Claim alleging Defendants USFS and BSC aided and abetted Callaghan in battering Plaintiff, the Seventh Claim alleging negligence against BSC, the Eighth Claim alleging negligence against USFS, and the Ninth Claim alleging intentional infliction of emotional distress against USFS and PSA.  The court addresses each in turn.

A.    **Aiding and Abetting Assault/Battery**

Plaintiff claims Defendants USFS and BSC aided and abetted Callaghan in assaulting Plaintiff, Complaint, Second Claim, as well as with regard to Callaghan's battery of Plaintiff, Fourth Claim (together, "aiding and abetting claims"), by continuing to allow Callaghan to use his membership in each organization to gain access to assault and batter Plaintiff. Complaint ¶¶ 83 and 88. In support of dismissal of the aiding and abetting claims for failure to state a claim, USFS argues Plaintiff fails to sufficiently allege USFS was aware of Callaghan's alleged unlawful conduct toward Plaintiff prior to 1999 when Plaintiff filed the USFS grievance. USFS's Memorandum at 5-7. BSC similarly argues it was not aware of the Callaghan's assault and battery of Plaintiff and Plaintiff fails to sufficiently allege facts demonstrating otherwise. BSC's Memorandum at 6-8.[17] In opposition, Plaintiff argues both BSC and USFS aided and abetted Callaghan's assault and battery of Plaintiff by failing to take any action against Callaghan to stop the abuse despite knowledge of Callaghan's unlawful conduct toward Plaintiff. Plaintiff's Response – USFS and BSC at 5-6. According to Plaintiff, had USFS terminated Callaghan's membership upon learning of Callaghan's abuse of Plaintiff, Callaghan would no longer have been in a position to coach, and thus abuse, Plaintiff.

---

[17] BSC also points out that included within the text of the claims for aiding and abetting assault and battery, Plaintiff alleges all four Defendants "conspired" to conceal the truth about the assault and battery Callaghan inflicted on Plaintiff without alleging any agreement between any Defendants which is insufficient to allege "civil conspiracy which cannot be extended to unknowing and innocent parties." BSC's Memorandum at 6-7 (referencing Complaint ¶¶ 84 and 89). Plaintiff clarifies that the civil conspiracy is alleged only with regard to USFS and PSA. Plaintiff's Response – USFS and BSC at 5 n. 5. With Plaintiff's discontinuing claims against PSA except for intentional infliction of emotional distress, Plaintiff's Response – PSA at 8, the conspiracy claim asserted against USFS must also be dismissed because a tortfeasor cannot conspire with itself. *See Bigio v. Coca-Cola Co.*, 675 F.3d 163, 176 (2d Cir. 2012) (observing that under New York law, a civil conspiracy requires pleading facts supporting, *inter alia*, "an agreement between two or more parties," and such 'parties' intentional participation in the furtherance of a plan or purpose. . . ." (quoting *Abacus Fed. Sav. Bank v. Lim*, 905 N.Y.S.2d 585, 588 (1st Dept. 2010))).

*Id*. at 7.  In further support of dismissal of the aiding and abetting claims, USFS argues Plaintiff has not pleaded sufficient facts to establish USFS was aware of Callaghan's abuse of Plaintiff.  USFS's Reply at 3-4.

"New York specifically recognizes a cause of action for aiding and abetting an assault and battery."  *Naughright v. Weiss*, 826 F.Supp. 2d 676, 691 (S.D.N.Y. 2011). "Aiding and abetting is a separate cause of action from the underlying tort, with its own elements."  *Canosa v. Ziff*, 2019 WL 498865, at *12 (S.D.N.Y. Jan. 28, 2019).  In New York, "[c]onspiracy and aiding and abetting are varieties of concerted-action liability: conspiracy requires an agreement to commit a tortious act, [whereas] aiding and abetting requires that the defendant have given ''substantial assistance or encouragement'' to the primary wrongdoer."  *Pittman by Pittman v. Grayson*, 149 F.3d 111, 122-23 (2d Cir. 1998) (quoting *Lindsay v. Lockwood*, 625 N.Y.S.2d 393, 397 (Sup.Ct. Monroe Cty. 1994) (quoting *Restatement (Second) of Torts* § 876(a) and (b))). "The elements of concerted-action liability are (1) an express or tacit agreement 'to participate in a common plan or design to commit a tortious act," (2) tortious conduct by each defendant, and (3) the commission by one of the defendants, if pursuance of the agreement, of an act that constitutes a tort."  *Id*. (quoting *Rastelli v. Goodyear Tire & Rubber Co*., 591 N.E.2d 222 (N.Y.1992)).  Further, "to sufficiently plead aiding and abetting liability under New York law, a plaintiff must establish (1) 'the existence of a violation by the primary wrongdoer,' (2) 'knowledge of this violation by the aider and abettor,' and (3) 'proof that the aider and abettor substantially assisted in the primary wrong.'"  *Rich v. Fox News Network, LLC*, 2020 WL 5768430, at *5 (S.D.N.Y. Sept. 25, 2020) (quoting *Renner v. Chase Manhattan Bank, N.A.*, 85 F. App'x 782, 784 (2d Cir.

2004).  Inherent in the elements for aiding and abetting liability is the requirement of a primary actor.  *Id*.  *See also Pittman by Pittman*, 149 F.3d at 123 ("[A]iding and abetting requires that the defendant have given substantial assistance or encouragement to the primary wrongdoer."); *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 206 F. Supp. 3d 869, 913 (S.D.N.Y. 2016) ("Under New York law, in order to be liable for acting in concert with a primary tortfeasor under a theory of either conspiracy or aiding and abetting, the defendant must know of the wrongful nature of the primary actor's conduct.").

In the instant case, the parties do not dispute that the Complaint sufficiently alleges Plaintiff was subjected to assault and battery by Callaghan, the putative primary wrongdoer.  Accordingly, to sufficiently allege the aiding and abetting claims, the Complaint must also alleged facts which, if true, establish USFS and BSC knew of Callaghan's abuse of Plaintiff and substantially assisted Callaghan with committing the conduct.  With regard to USFS, Plaintiff alleges "members of USFA . . . were aware that Callaghan was providing Craig, his underage student, with alcohol and bringing him to bars," Complaint ¶ 38, and that "it was widely known among members of USFS . . . that Callaghan had been pushed out of BSC because of his abuse of Craig and others."  *Id*. ¶ 41.  As USFS argues in support of dismissal, USFS Memorandum at 6, however, even if these allegations are true, members of USFS are neither employees nor agents of USFS as required to attribute knowledge of Callaghan's alleged abuse of Plaintiff to USFS.  *See IDX Capital, LLC v. Phoenix Partners Group*, 922 N.Y.S.2d 304, 307 (1st Dept. 2011) (holding claims asserted against defendant "rogue employee" whose tortious acts were outside the scope of employment with defendant employer were

insufficient to impose liability against employer on aiding and abetting claim absent employer's awareness of conduct specifically targeting the employee plaintiff). Accordingly, the assertions that "members" of USFS knew of Callaghan's abuse of Plaintiff yet failed to take steps to halt the abuse fails to state a claim of aiding and abetting against USFS.  Nor does Plaintiff's allegation that a "former President of USFS" warned a skating coach that Callaghan is a "terrible person," Complaint ¶ 62, sufficiently allege knowledge sufficient to hold USFS liable for aiding and abetting Callaghan's alleged abuse of Plaintiff.  *See IDX Capital, LLC*, 922 N.Y.S.2d at 307 (actions by former employees are insufficient to hold employer liable for aiding and abetting tortious conduct).  Similarly, Plaintiff's allegations that unidentified "skating judges" knew of the alleged abuse, Complaint ¶ 62, are also insufficient to hold USFS liable on the aiding and abetting claims because there are no allegations that such judges are employees or agents of USFS.  *See IDX Capital, LLC*, 922 N.Y.S.2d at 307.  Accordingly, USFS's Motion should be GRANTED with regard to the aiding and abetting claims which should be DISMISSED as against Defendant USFS.

In contrast, Plaintiff's allegations against BSC sufficiently state the aiding and abetting claims.  In particular, the Complaint alleges that in the late 1970s, a group of USFS National Judges, including a BSC Board member, discussed rumors that Callaghan was engaging in sexual activity with boy skaters, Complaint ¶ 62, a Zamboni driver at the ice rink complained to a member of BSC's Board of Directors that he witnessed Callaghan molesting a student, *id*. ¶ 60, that another BSC Board member refused to permit his child to train with Callaghan because the Board member knew Callaghan was sexually involved with male skaters, *id*. ¶ 61, and that during a skating

34

competition several parents became aware of Callaghan's abusive conduct and complained to the BSC Board members who then waited until the end of the skating competition season to fire Callaghan. *Id*. *See also* Complaint ¶ 40 (". . . in 1980 Callaghan was pushed out of BSC, in part because of his abuse of Craig."). Despite allegedly terminating Callaghan as a coach because of Callaghan's sexual abuse of young male skaters, BSC then endorsed Callaghan for a coaching position with Philadelphia Skating Club and Humane Society in Pennsylvania, Complaint ¶ 40, where Callaghan's abuse of Plaintiff continued. *Id*. ¶ 42. These allegations, if proven at trial, would sufficiently establish Defendant BSC knew of Callaghan's alleged abuse, yet took no action to stop the abuse. Significantly, the Complaint's allegation that after several parents complained to the BSC Board about Callaghan's behavior during a skating competition, the Board fired Callaghan demonstrates the Board had some awareness of the harm Callaghan caused the abuse skaters, yet even then, BSC waited for the end of competition season to terminate Callaghan thus allowing Callaghan's abuse of young male skaters to continue at the BSC. The Complaint thus sufficiently states the aiding and abetting claims against BSC and BSC's motion should be DENIED with regard to the aiding and abetting claims.

### B.    Negligence

Plaintiff's Seventh Claim alleges BSC, by allowing Callaghan to coach at its facility, despite knowledge of reports and complaints regarding Callaghan's abuse of minor male skaters, was negligent in failing to provide Plaintiff with a safe environment and protect students from harm. Complaint, Seventh Claim. Plaintiff's Eighth Claim alleges USFS, by ignoring numerous reports and complaints that Callaghan was

providing underage skating students with alcohol and pornography, sexually harassing boy skaters, and engaging in sexual activity with boy skaters, particularly Plaintiff, breached a duty to Plaintiff to ensure the coaches USFS certified and permitted to coach under the auspices of USFS did not engage in conduct harmful or detrimental to students.  Complaint, Eighth Claim.

In support of dismissal, BSC argues that it cannot be held vicariously liable for any abuse by Callaghan because the alleged abusive conduct would have been outside the scope of Callaghan's employment, BSC's Memorandum at 8-10, and Plaintiff has failed to allege any special relationship existed imposing on BSC a duty to protect Plaintiff from Callaghan.  *Id*. at 10-11.  USFS argues in support of dismissal that Plaintiff fails to allege USFS owed Plaintiff a duty to protect Plaintiff from abusive conduct by Callaghan, or that USFS had a special relationship with Callaghan pursuant to which USFS had a duty to control Callaghan's conduct to prevent harm to a third party, here, Plaintiff.  USFS's Memorandum at 7-10.  USFS further argues Plaintiff failed to plead facts establishing USFS had actual knowledge of Callaghan's misconduct.  *Id*. at 10.  In opposition, Plaintiff argues that as the lessee of the ice rink where Plaintiff trained with Callaghan, BSC had a duty to take reasonable measures to control the foreseeable conduct of third parties on its property to prevent intentional harm to others.  Plaintiff's Response – UFSF and BSC at 3-5.  Plaintiff further argues that USFS, by granting Callaghan a coach membership in its organization, assisted Callaghan in attracting students to train and that Callaghan would not have been Plaintiff's coach if Callaghan were not a coach member of USFS.  *Id*. at 7.  In further support of dismissal, USFS repeats that Plaintiff failed to alleged facts establishing USFS had the ability to "control"

Callaghan such that USFS owed Plaintiff no duty to protect Plaintiff from harm.  USFS's Reply at 4-5.

With regard to BSC, "[l]andowners in general have a duty to act in a reasonable manner to prevent harm to those on their property.  *D'Amico v. Christie*, 518 N.E.2d 896, 899–900 (N.Y. 1987) (citing *Basso v. Miller,* 352 N.E.2d 868, 872 (N.Y. 1976)).  "In particular, they have a duty to control the conduct of third persons on their premises when they have the opportunity to control such persons and are reasonably aware of the need for such control.  *Id*. (citing *De Ryss v. New York Cent. R.R. Co.,* 9 N.E.2d 788, 792 (N.Y. 1937)).  Because some of Callaghan's abuse of Plaintiff occurred at the ice rink owned by BSC, and in light of Plaintiff's other allegations that could support finding BSC was aware of Callaghan's nefarious behavior, *see* Discussion, *supra*, at 34-35, such that Callaghan's conduct toward Plaintiff was foreseeable, as well as that BSC eventually terminated Callaghan because of repeated reports of abuse thus demonstrating BSC had control over Callaghan, Plaintiff sufficiently states a negligence claim against BSC and BSC's Motion should be DENIED as to the Seventh Claim.

As for the negligence claim asserted against USFS, insofar as Plaintiff maintains, were it not for USFS's continued certification of Callaghan as a figure skating coach, Plaintiff never would have chosen to train under Callaghan and, thus, Callaghan would not have had access to Plaintiff to abuse him, the court's research finds no case on point and the parties do not reference any.  Nevertheless, in *Steinborn v. Himmel*, 780 N.Y.S.2d 412 (3rd Dep't 2004), the court considered negligence claims asserted against the Boy Scouts of America for retaining for more than 10 years a scout leader against whom claims of sexual misconduct were later made.  The court construed the claim as

alleging negligent supervision, which would have merit if the plaintiffs demonstrated the defendant knew of the scout leader's propensity to commit the alleged unlawful acts or should have known of such propensity upon naming the defendant as a scout leader. *Steinborn*, 780 N.Y.S.2d at 415. Because, however, the plaintiffs' failed to support the claim that the organization should have been aware of the danger posed by the scout leader, the claim was denied as against the Boy Scouts organization. *Id*. Similarly, in the instant case, as discussed in connection with the aiding and abetting claims, Discussion, *supra*, at 33-34, Plaintiff has failed to sufficiently allege USFS was aware of Callaghan's propensity to sexually abuse the young male skaters, including Plaintiff, prior to Plaintiff's filing the USFS grievance in 1999. Accordingly, the negligence claim asserted against USFS fails to survive dismissal and USFS's Motion should be GRANTED with regard to the Eighth Claim.

### C. Intentional Infliction of Emotional Distress

Plaintiff's Ninth Claim asserts intentional infliction of emotional distress ("IIED claim") against both PSA and USFS relative to the denial of Plaintiff's PSA grievance and USFS grievance. Ninth Claim. In particular, Plaintiff alleges PSA engaged in outrageous conduct in finding Plaintiff's allegations that Callaghan's conduct, including that Callaghan gave Plaintiff, who was underage, alcohol and pornography, "groomed" and manipulated Plaintiff and then sexually abused Plaintiff for years, did not violate PSA's ethical standards was emotionally devastating to Plaintiff. Complaint ¶ 105. Plaintiff similarly alleges that in an effort to protect Callaghan and itself, USFS engaged in a scheme to discredit Plaintiff and the claims made in the USFS grievance and manufactured a process allowing Disbrow to dismiss the USFS grievance without

conducting any investigation into whether Callaghan was a dangerous predator who should not be permitted access to young students and with complete disregard for determining the truth of Plaintiff's USFS grievance, resulting in severe emotional distress to Plaintiff.  Complaint ¶¶ 103-04.

In support of dismiss, PSA argues the IIED claim is substantively deficient, PSA's Memorandum at 3-5, and is time-barred.  *Id*. at 5-7.  USFS likewise argues the IIED claim is barred by the statute of limitations and, alternatively, fails to allege conduct sufficient to sustain an IIED claim.  USFS's Memorandum at 10-12.  In opposition, Plaintiff argues the gravamen of the IIED claim against PSA and USFS is not the summary dismissal of the PSA and USFS grievances, but the cover-up by PSA and USFS of the abuse to protect the Defendant Entities and Callaghan, which conduct is indicative of the institutional harm the CVA's suspension of statutes of limitations is intended to redress.  Plaintiff's Response – PSA at 5-8; Plaintiff's Response - USFS at 10-13.  Plaintiff further maintains Callaghan's sexual abuse of Plaintiff, which continued for years, is precisely the type of egregious and outrageous conduct that supports a claim for IIED.  Plaintiff's Response – PSA at 2-5; Plaintiff's Response – USFS and BSC at 10-13.  In further support of dismissal of the IIED claim, PSA argues that promptly appointing a three-person grievance panel to review the PSA grievance can never support an IIED claim, PSA's Reply at 3-5, and repeats the argument that the IIED claim is time-barred.  *Id*. at 5-7.  USFS argues in further support of dismissal of the IIED claim that the claim is time-barred, USFS Reply at 5-7, and that USFS's dismissal of the USFS grievance does not rise to the level of outrageous conduct necessary to state a claim for IIED.  *Id*. at 8-9.

Preliminarily, the court observes that despite Plaintiff's assertion that he is alleging egregious and outrageous conduct based on the denials of his USFS and PSA grievances which were intended to continue the cover-up of the alleged abuse, Plaintiff's Response – PSA at 2-5; Plaintiff's Response – USFS and BSC at 10-13, a plain reading of the Complaint supports the construction of the IIED claim urged by PSA and USFS, *i.e.*, that the denial of the USFS and PSA grievances without conducting a proper investigation which would have led to Callaghan's termination as a coach and prevented Callaghan's continued sexual abuse of young male skaters, constituted extreme and outrageous conduct.

"To state an IIED claim, a plaintiff must plausibly allege the existence of (1) extreme and outrageous conduct, (2) an intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Specht v. City of New York*, 15 F.4th 594, 606 (2d Cir. 2021) (citing *Howell v. New York Post Co., Inc.*, 612 N.E.2d 699, 702 (N.Y. 1993). "To meet this standard, the conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized' society.'" *Id*. (quoting *Murphy v. American Home Products Corp.*, 448 N.E.2d 86, 90 (N.Y. 1983)).

In the instant case, the IIED claims as alleged against USFS and PSA are based on alleged deficient investigations into the USFS and PSA grievances intended to cover up child sexual abuse by Callaghan. Even assuming such allegations are true, an issue not before the court on the present Rule 12(b)(6) motions to dismiss, there are insufficient allegations that either USFS or PSA was aware of the abuse prior to

Plaintiff's filing of the grievances in 1999 which, given Plaintiff's birth in 1963, was eight years after the alleged child sexual abuse occurred, and five years after all sexual activity between Plaintiff and Callaghan ceased.  Additionally, the Complaint is devoid of any allegation that, in connection with their handling of the respective grievances, either USFS or PSA *intended* to cause Plaintiff severe emotional distress as required to plausibly allege an IIED claim.  *See Romero v. City of New York*, 839 F. Supp. 2d 588, 629 (E.D.N.Y. 2012) (dismissing for failing to state claim for intentional infliction of emotional distress, asserted by formers students against education department that employed the teacher who allegedly sexually abused the plaintiffs while minors, because the complaint was devoid of any allegation that could be construed as alleging the defendant education department intended to cause severe emotional distress) (citing *Tesoriero v. Syosset Central School District,* 382 F.Supp.2d 387, 403 (E.D.N.Y. 2005) (granting summary judgment where plaintiffs offer no evidence that defendant teacher or defendant school district "ever *intended* to cause [plaintiffs] severe emotional distress.")).  Similarly, in the instant case, although Plaintiff alleges the conduct of USFS and PSA in handling their respective grievances was deficient, Plaintiff does not allege such deficiency was intended by either USFS or PSA to cause Plaintiff severe emotional distress.  Accordingly, dismissal of the IIED claim against USFS and PSA should be GRANTED.

Alternatively, the record also supports dismissing the IIED claim as time-barred as against both PSA and USFS.  In particular, New York's CVA revived potential civil claims arising from childhood sexual abuse.  N.Y. Civ.Prac.L.&R. § 214-g.  Significantly, as relevant here, the CVA applies to "every civil claim or cause of action brought against

any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered as a result of conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law committed against a child less than eighteen years of age, . . . ."  N.Y. Civ.Prac.L.&R. § 214-g.  Plaintiff's IIED claim, however, is not based on the conduct of either PSA or USFS constituting a sexual offense.  Accordingly, Plaintiff's IIED claim, as pleaded, is not subject to the benefit of the CVA's extension of statutes of limitations and, thus, is time-barred by New York's generally applicable three-year limitations period for tortious conduct.  N.Y. CPLR § 214.

**3.    Request to Strike**

Although it is recommended all claims against USFS be dismissed, alternatively, should the District Judge not agree, USFS's request that the allegations pertaining to its investigation into the USFS grievance should be stricken, asserted not as a motion but as an argument in support of USFS's Motion seeking dismissal of the IIED claim, USFS's Memorandum at 13-14, is addressed in the interest of completeness.[18]  Relying on Fed.R.Civ.P. 12(f), Defendant USFS argues the allegations pertaining to USFS's investigation into the USFS grievance, set forth in eight paragraphs of the Complaint, specifically, Complaint ¶¶ 66-73, should be stricken from the Complaint as immaterial to Plaintiff's claims and prejudicial to USFS.  USFS's Memorandum at 13-14.  In opposition, Plaintiff argues the allegations relate to USFS's alleged cover-up of

---

[18] The court notes that motions to strike material from pleadings "that does not directly foreclose any claims or defenses generally are non-dispositive . . . ."  *Teixeria v. St. Jude Med., Inc.*, 2015 WL 902616, at *1 (W.D.N.Y. Mar. 3, 2015), *report and recommendation adopted in part, rejected in part*, 193 F. Supp. 3d 218 (W.D.N.Y. 2016).

Plaintiff's 1999 USFS grievance and, thus, directly relate to USFS's "consciousness of guilt" which "could expose former USFS President James Disbrow and USFS's knowledge of Callaghan's abuse." Plaintiff's Response – USFS and BSC at 13-14. In further support of striking the allegations, USFS argues the eight paragraphs at issue pertain only to events occurring in 1999 when Plaintiff filed the USFS grievance and more than 20 years after Callaghan's alleged abuse of Plaintiff as a minor and, thus, are completely immaterial and irrelevant to Plaintiff's claims brought pursuant to the CVA. USFS's Reply at 9.

"Courts may strike material from the pleadings either 'on its own' or 'on motion made by a party.'" *Brown v. Maxwell*, 929 F.3d 41, 52 n. 42 (2d Cir. 2019) (quoting Fed.R.Civ.P. 12(f)). "In deciding whether to [grant] a Rule 12(f) motion on the ground that the matter is impertinent and immaterial, it is settled that the motion will be denied, unless it can be shown that no evidence in support of the allegation would be admissible." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) (citing cases and 2A Moore's Federal Practice P 12-21(1) (2d ed. 1975)). "Although motions to strike material *solely* 'on the ground that the matter is impertinent and immaterial' are disfavored, when material is also 'scandalous,' no such presumption [of admissibility] applies." *Brown*, 929 F.3d 52 n. 42 (italics in original) (citing cases).

In the instant case, except for alleging that Plaintiff was motivated to file the USFS grievance "to protect other students" from Callaghan," Complaint ¶ 66, the allegations USFS seeks to strike pertain solely to the investigation by former USFS President Disbrow of Plaintiff's USFS grievance. In particular, the allegations at issue include that Disbrow was concerned that if Callaghan's abuse of Plaintiff became

known, Disbrow's own involvement in sexually abusing male skaters would be revealed,

Complaint ¶ 67-68, as well as Disbrow's questionable handling of the USFS grievance

by first removing Hazen as the USFS Grievance Committee Chair and instructing

Hazen to forward investigation materials to Disbrow who then empaneled a three-

person commission to investigate the grievance, *id*. ¶ 69-70, replacing the ethics

committee chair with one Jon Jackson ("Jackson"), and then rendering Disbrow's own

decision on the USFS grievance.  Complaint ¶¶ 67-71.  As a result, one month after

Plaintiff filed the USFS grievance, and without anyone interviewing Plaintiff regarding

the grievance, Disbrow informed Jackson that he was not referring the Plaintiff's claims

in the USFS grievance to the ethics committee but instead, the claims were being

dismissed, in violation of USFS bylaws that permitted USFS to bring its own grievance

against a coach alleged to have molested a student.  *Id*. ¶¶ 72-73.  Significantly, these

allegations pertain to a period after Plaintiff was no longer a minor and, thus, are

irrelevant to the claims before the court by virtue of the CVA.  *Lipsky*, 551 F.2d at 893.

Further, Disbrow is not a defendant to this action, and the allegations are utterly

irrelevant to the Complaint such that no evidence relevant to these allegations, which

are of a scandalous nature, would be admissible at trial.  *See Brown*, 929 F.3d 52 n. 42

(when material sought to be stricken is "scandalous," the presumption against striking

the material solely because the matter is impertinent and immaterial does not apply).

Accordingly, ¶¶ 66-73 of the Complaint should be stricken.


In sum, Defendant Callaghan's motion to set aside the default should be

GRANTED as Defendant Callaghan has established the default was not willful, a

meritorious defense, and no resulting prejudice to Plaintiff. Defendants USFS and PSA's Motions to dismiss should be GRANTED as Plaintiff's allegations fail to provide sufficient basis to find liability based on aiding and abetting, negligence or intentional infliction of emotional distress, with USFS and PSA terminated as Defendants to this action; alternatively, Defendant USFS's request to strike material from the Complaint is GRANTED. Defendant BSC's Motion should be DENIED because the Complaint plausibly alleges BSC's conduct with regard to Callaghan's employment and use of BSC's ice rink facility aided and abetted, as tortious conduct, Callaghan's alleged assault and battery of Plaintiff, and was negligent in failing to protect Plaintiff from Callaghan's abusive conduct.

## CONCLUSION

Based on the foregoing, Callaghan's Motion (Dkt. 38) seeking to set aside entry of default is GRANTED and the Clerk of Court is directed to vacate the default entered on September 3, 2020 (Dkt. 17); PSA's Motion (Dkt. 13) should be GRANTED; USFS's Motion (Dkt. 26) should be GRANTED; BSC's Motion (Dkt. 33) should be DENIED; the action should be DISMISSED as against Defendants PSA and USFS; alternatively, USFS's request to strike certain allegations from the Complaint is GRANTED.

SO ORDERED, as to Defendant Callaghan's
Motion to Set Aside Entry of Default and as to
the alternative decision regarding USFS's request
to strike material from the Complaint.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

Respectfully submitted, as to Defendant Entities'
Motions to Dismiss,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      February 25th, 2022
            Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:       February 25th, 2022
             Buffalo, New York